IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| AZTEC OIL AND GAS, INC. and | § | |
| AZTEC ENERGY, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | Civil Action No. _____ |
| *vs.* | § | |
| | § | |
| FRANK FISHER, ROBERT SONFIELD, | § | |
| L. MYCHAL JEFFERSON, II., | § | |
| LIVINGSTOn GROWTH FUND TRUST | § | |
| and  INTERNATIONAL FLUID | § | |
| DYNAMICS, L.L.C., | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Aztec Oil and Gas, Inc. and Aztec Energy, LLC file this their Original Complaint as follows:

### 1. PARTIES

#### A.  Plaintiffs

1.1    Plaintiff Aztec Oil and Gas, Inc. ("Aztec Oil")  is a corporation that is organized under the laws of the State of Nevada.

1.2    Plaintiff Aztec Energy, LLC ("Aztec Energy") is a limited liability company that is organized under the laws of the State of Nevada.

#### B. Defendants

1.3    Defendant Frank Fisher ("Fisher") is a citizen of the State of Texas.  Fisher may be served with process at 1212 Potomac Drive, Houston, TX 77057; or at other such address as he may be found.

1.4    Defendant Robert Sonfield ("Sonfield") is a citizen of the State of Texas.

Sonfield may be served with process at 2500 Wilcrest Drive, Suite 300, Houston, TX 77042; or at other such address as he may be found.

1.5     Defendant L. Mychal Jefferson, II ("Jefferson")is a citizen of the State of Texas.  Jefferson may be served with process at 1330 Post Oak Blvd, Houston, TX 77056; or other such address as he may be found.

1.6     Defendant International Fluid Dynamics, L.L.C. ("IFD") is a company organized under the laws of the State of Texas.  Defendant has its principal place of business in the State of Texas.  Defendant may be served with process by serving its registered agent, Franklin Fisher at 1212 Potomac Drive, Houston, TX 77057.

1.7     Defendant Livingston Growth Fund Trust ("Livingston") is Fisher's trust. Sonfield is trustee of the trust.  Process may be served on Robert L. Sonfield, Trustee, Livingston Growth Fund Trust, 2500 Wilcrest Dr. Suite 300 Houston, TX 77042.

1.8     Service is requested at this time.

## 2. <u>JURISDICTION</u>

2.1     This Court has jurisdiction over the lawsuit because the suit arises under federal claims including the Securities and Exchange Act of 1934, as amended (the "Exchange Act") and the Securities Act of 1933, as amended (the "Securities Act").

2.2     This Court also has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## 3. <u>VENUE</u>

3.1     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendants Fisher, Sonfield, and Jefferson reside in this district.

## 4.  CONDITIONS PRECEDENT

4.1     All conditions precedent have been performed or have occurred.

## 5.  FACTS

### A.  Corporate Background

5.1     On January 26, 1986, Asterisk, Inc. was formed as a Utah corporation to serve as a "blind pool," a company which has no disclosed business purpose, but has the goal to become publicly traded and then find a merger partner at some point in the future. Asterisk's name was subsequently changed to Aztec Communications Group, Inc. ("Aztec Communications") on August 31, 1987.

5.2     In August 1987, Aztec Communications had business operations in the broadcast and television business.

5.3     At some point after formation, Aztec Communications began filing reports with the Securities and Exchange Commission ("SEC") and its common stock obtained a quotation on the Over-The-Counter ("OTC") "pink sheets" market.

5.4     As a result of adverse business circumstances, Aztec Communications  sold all of its business operations in 1990, and no material business operations were undertaken by the company from 1990 to 2000, until the occurrence of the events described below.

5.5     In 1994, Aztec Communications' corporate charter in Utah was forfeited due to its failure to file required annual reports with the State of Utah. Pursuant to Utah law, if no reinstatement proceedings are filed within two years of a corporation having its charter forfeited, such charter cannot be reinstated and such corporation is considered dissolved.  Aztec Communications did not reinstate its charter within the two years after such charter was forfeited.  As such, Aztec Communications was administratively dissolved by the State of Utah.

5.6     On March 16, 2000, one of the last directors of Aztec Communications prior to the loss of its charter, Andrew Palmquist, attempted to hold a special meeting of the purported Board of Directors and to appoint L. Mychal Jefferson II ("Jefferson"), as Chairman, Chief Executive Officer and President of Aztec Communications, and John Schwarz and Monica Jefferson as Directors of Aztec Communications (the "New Appointments").

5.7     On April 21, 2000, Jefferson attempted to hold a special shareholders meeting to discuss the reorganization of Aztec Communications, pursuant to which the shareholders purported to vote to: re-affirm the New Appointments; "reorganize, revive and recapitalize the corporation"; "file [a] revival application with the State of Utah"; "support the new board and officers in any and all endeavors regarding the reorganization of the company"; and "give the new board and officers all powers necessary to remake the company into a viable ongoing concern."

5.8     In October 2000, Aztec Communications began filing periodic reports with the SEC.  Specifically an Annual Report on Form 10-KSB for the year ended August 31, 2000 was filed on October 10, 2000.[1]

5.9     Beginning in October 2000, Jefferson, purporting to be President of Aztec Communications, sought to reinstate Aztec Communications' corporate charter in Utah.

5.10    On November 16, 2000, the Utah Division of Corporations and Commercial Code ("Division") denied Jefferson's application for reinstatement on the grounds that more than two years had elapsed since Aztec Communications' involuntary dissolution. Jefferson appealed this decision on December 7, 2000. The denial was affirmed by the

---

[1]     Although Aztec Communications previously filed reports with the SEC, no reports have been filed with the SEC since approximately August 2012.  The company terminated its reporting obligations with the SEC in April 2009.

Division's Executive Director on January 24, 2001.  On February 23, 2001, Jefferson filed a petition in the Third Judicial District Court, Salt Lake County, requesting the dissolution be set aside by the court.

5.11    The Division responded to Jefferson's petition by showing that Aztec Communications "ceased to exist" when it was dissolved six years prior in 1994.  The Division further clarified to the court that because of this dissolution, Jefferson could not purport to be its President or be given authority to act on behalf of Aztec Communications, as it does not exist.  The Division showed that Jefferson only sought reinstatement in order to merge Aztec Communications with another entity so that the resulting company could be publicly traded while avoiding "going through the process of registering its securities and disclosing information about the company and its officers."  The Division noted that all actions taken to "appoint new officers, to revive the corporation, to grant new stock options, and to hire the new president, [Jefferson], of Aztec [Communications] to sell the company . . . are without any legal basis."

5.12    The State of Utah, in its response to Jefferson's petition to the state court, stated that "the only value that exists in Aztec [Communications] is that its stock previously was publicly traded."  Utah argued that to allow reinstatement was "contrary to the purposes of the state and federal laws requiring registration of securities and public disclosures" and that allowing reinstatement would "facilitate fraud."

5.13    On June 12, 2001, the state court agreed and dismissed the petition filed by Jefferson.  In its order, the state court noted that Jefferson could simply form a new company with the same name in Utah and that public policy concerns such as guarding against potential securities law violations necessitated the dismissal of the petition.

5.14    In July 2003, Jefferson requested an appeal of the decision from the Utah

Department of Commerce.   The Department responded that the decision was final and Aztec Communications' corporate status could not be reinstated.

5.15    The Utah Secretary of State currently reflects Aztec Communications' status as "Expired" with the description showing "Invol. Diss/No Renewal" (involuntarily dissolved, no renewal).

5.16    As a dissolved corporation under Section 16-10a-1404 of the Utah Revised Business Corporation Act, as of 1994, Aztec Communications was not legally allowed to carry on any business, except to wind up and liquidate its business and affairs.  Because Aztec Communications had not conducted any business or operations since at latest 1994, Aztec Communications had no business or affairs to wind up or liquidate.

5.17    Throughout the process of seeking reinstatement, a Houston attorney purporting to specialize in securities and corporate law, Robert Sonfield ("Sonfield"), acted as the attorney for Jefferson and Aztec Communications.  Houston attorney and close friend of Sonfield, Frank Fisher ("Fisher"), loaned money to Aztec Communications through his company International Fluid Dynamics, L.L.C. ("IFD") to fund the legal fees.

5.18    Sonfield was engaged as legal counsel by Aztec Communications on August 22, 2003 as "special counsel in corporate and securities regulation matters as may be required in connection with the reincorporation of Aztec Communications Group, Inc. from Utah to Nevada".

5.19    On January 10, 2004, by a statement of unanimous consent, Jefferson, Terry Roberts, and Monica Jefferson, purporting to act as directors for Aztec Communications Group, a Utah Corporation, dismissed Fidelity Transfer Company as the transfer agent for Aztec Communications and named Cottonwood Stock Transfer Corporation as the new

transfer agent.  However, notice of termination was not sent to Fidelity Transfer Company until July 19, 2004.  Thus, Fidelity Transfer Company never sent the new transfer agent a certified shareholder list with certificate numbers.

5.20    On January 20, 2004, despite Utah's clear edict on Aztec Communications' corporate status, Jefferson, Sonfield, and Fisher attempted to "merge" Aztec Communications, the dissolved Utah corporation, into Aztec Communications Group, Inc., a Nevada corporation formed by Sonfield as incorporator on November 24, 2003.  Aztec Communications Group, Inc. was to be the surviving company.  Sonfield filed the articles of incorporation with Nevada, and Jefferson, Terry Roberts, and Monica Jefferson were named as directors of the new entity.  Jefferson signed the Articles of Merger which were filed with Nevada on April 20, 2004.

5.21    Utah does not have the Articles of Merger on file, as a dissolved corporation cannot merge with another company.  In fact, Utah's Division of Corporations confirmed that when articles of merger were attempted to be filed by Jefferson with the Secretary of State of Utah, they were sent back as rejected because Aztec Communications corporate status had "expired."

5.22    Under Utah law, Articles of Merger are required to be filed by a corporation "merging out" of Utah before such merger can be effective.  Additionally, the Plan and Agreement of Merger adopted by Aztec Communications and Aztec Communications Group, Inc. on October 25, 2003, made clear that the effective time of the Plan and Agreement of Merger was the last to occur of several items including "the date [the] Plan of Agreement of Merger, or a certificate of merger meeting the requirements of the Utah Revised Statutes, is filed with the Secretary of State of Utah", which event never occurred and which "merger" was therefore never valid.

5.23    Notwithstanding a) the fact that the State of Utah made it clear that Aztec Communications was dissolved and could only wind up and liquidate, b) the fact that the Plan of Agreement and Merger pursuant to its own terms was not effective without the required articles of merger filing in Utah, c) the fact that Utah rejected the attempted filing of such articles of merger, and d) the fact that a dissolved corporation cannot be merged, Jefferson, Sonfield, and Fisher began to conduct business in Aztec Communications name as if the merger had been effective.

5.24    On July 15, 2004, a shareholder meeting was held to change Aztec Communications' name to Aztec Oil and Gas, Inc. ("Aztec Oil").  The name was officially changed in Nevada on August 13, 2004.  As such, Aztec Communications is hereinafter referred to as Aztec Oil.

### B.  Series A Preferred Stock

5.25    Subsequent to the invalid merger, Jefferson, Sonfield, and Fisher began taking action to insure their complete control of Aztec Oil while reaping substantial financial gain for themselves.

5.26    On June 11, 2004, a resolution of the Board of Directors was passed to designate "Series A Preferred Stock" ("Series A Stock") consisting of 100,000 shares.  The Series A Stock was purportedly given a non-dilutable 70% voting right, meaning whoever owned the 100,000 shares controlled 70% of Aztec Oil's total shareholder vote on any and all shareholder matters (the result of which was that common stock shareholders effectively had no voting rights whatsoever, as all outstanding common stock shares only voted an aggregate of 30% of the total vote on outstanding matters, a significant minority position).

5.27    A total of 50,000 of the shares of the Series A Stock went to SBI USA, LLC ("SBI") an investment banking firm in accordance with the terms of an Investment Advisory

Agreement.  It was resolved that the other 50,000 shares were to be sold to Pragmatica Partners, LLC ("Pragmatica").

5.28    On August 4, 2004, Pragmatica signed a Purchase Representation Letter agreeing to purchase 50,000 shares of the Series A Stock for $15,000.  Pragmatica was a Delaware company, presently no longer in existence, that was formed only four days before the signing of the resolution that created the Series A Stock.  Fisher was attorney-in-fact for Pragmatica and signed the Purchase Representation Letter regarding the purchase of the Series A Stock on behalf of Pragmatica.

5.29    On August 5, 2004, instead of paying Aztec Oil, Pragmatica paid the $15,000 to Sonfield for "full payment of the fees owing by" Aztec Oil.

5.30    On August 24, 2004, the certificate of designation for the Series A Stock was signed by Jefferson.  They were filed in Nevada on August 26, 2004.

5.31    On August 27, 2004, just one day after the certificate of designation for the Series A Stock shares was filed with Nevada, SBI transferred its right to receive all 50,000 shares of Series A Stock to Alpen Finanz, Ltd. ("Alpen") located in Zurich, Switzerland.  The consideration for this purported 35% voting right in Aztec Oil was $100.

5.32    In September 2004, the original Investment Advisory Agreement between Aztec Oil and SBI which provided for SBI to receive the 50,000 Series A Stock shares was amended and restated and such new agreement as amended and restated failed to include any mention of the 50,000 Series A Stock shares which as described above had subsequently been transferred to Alpen.

5.33    On December 28, 2004, Pragmatica subsequently sold all 50,000 shares of its Series A Stock.  For consideration of just $100, Pragmatica transferred its purported 35% voting right in Aztec Oil to another company located in Zurich, Switzerland, Sage

Capital Zurich AG, Trustee ("Sage"). Despite the later transfers, Fisher's initials are found on an August 27, 2004 Preferred Stockholders Agreement regarding the rights of the Series A Stock, evidencing his immediate ownership of the shares.

5.34    Presently, Fisher, by and through his trust, the Livingston Growth Trust Fund purports to own all 100,000 shares of the Series A Stock issued by Aztec Oil. Thus, Fisher, through his trust, purports to have a non-dilutable 70% voting right in Aztec Oil. Sonfield is the trustee of the Livingston Growth Trust Fund.

### C. Resignation of Directors and Power of Attorney

5.35    On August 6, 2004, less than 8 months after the purported merger of Aztec Oil, the entire board of directors tendered their resignation, "effective upon acceptance". The same day, the board executed a legally ineffective power of attorney granting Sonfield virtually unrestricted powers to act on behalf of the board in his "sole discretion."

5.36    Despite tendering their resignations on August 6, 2004, the resignations were not purportedly "accepted" until a year later on August 8, 2005 by Sonfield acting through the ineffective power of attorney. During the interim, Sonfield acted for the directors, purporting to act on behalf of Aztec Oil as attorney-in-fact for each member of the Board of Directors in all matters.

5.37    On August 9, 2004, Sonfield, as attorney-in-fact, signed a resolution amending the stock warrant and award plan and amending the consulting agreement between Aztec Oil and IFD, further strengthening IFD's, and consequently Fisher's, control of the company.

5.38    On September 6, 2004, Sonfield signed a resolution authorizing the issuance of warrants providing the right to acquire 2,000,000 restricted shares of common stock to Xinhua Financial Network in consideration for their work to investigate and develop

business opportunities for Aztec Oil in Asia and worldwide.  Xinhua was subsequently the subject of a subpoena by the Department of Justice issued to IFD.  In February 2013, Dennis L. Pelino, the principal of Xinhua, pled guilty to conspiracy to impede the lawful functions of the Internal Revenue Service.

5.39    On September 9, 2004, Sonfield signed the Form 8-K filed by Aztec Oil. This From 8-K lacked required disclosures.

5.40    On September 29, 2004, Sonfield signed a resolution electing officers for Aztec Oil.  The newly appointed Vice President/Secretary/Treasurer named, Danyel Owens, was Sonfield's legal assistant at the time.  The resolution also authorized Aztec Oil to borrow $127,500 each from IFD and SBI.

5.41    On October 25, 2004, Sonfield signed a term credit agreement authorized in the previous resolution between Aztec Oil and SBI.  SBI was subsequently the subject of a subpoena by the Department of Justice issued to IFD.  In February 2013, the principal of SBI, Shelly Singhal, pled guilty to conspiracy to impede the lawful functions of the Internal Revenue Service.

5.42    On November 11, 2004, Sonfield signed a representation letter to Aztec Oil's auditors.   In this letter, Sonfield represented, among other things, that there is no fraud or suspected fraud affecting Aztec Oil.

5.43    On December 1, 2004, Sonfield signed a resolution authorizing Aztec Oil to issue himself 10,000 shares of Aztec Oil's Form S-8 free trading stock in return for legal services Sonfield provided to Aztec Oil as corporate counsel for Aztec Oil. Based on the price at the time, this stock would have been worth approximately $13,000.

5.44    On December 15, 2004, Sonfield signed a legal representation letter to Aztec Oil's auditors.   Sonfield represented that he was not aware of any unasserted possible

claims or assessments against Aztec Oil.

5.45    On December 30, 2004, Sonfield signed a resolution repricing warrants issued to IFD for the benefit of IFD.

5.46    On January 2, 2005, Sonfield signed a resolution extending certain dates referenced in the agreement between Aztec Oil and IFD for IFD's benefit.

5.47    On March 16, 2005, Sonfield signed a resolution authorizing Aztec Oil to issue himself 11,000 shares of Aztec Oil's Form S-8 free trading stock in return for legal services Sonfield provided to Aztec Oil as corporate counsel for Aztec Oil.

5.48    On May 19, 2005, Sonfield signed a resolution authorizing Aztec Oil to issue himself 20,000 shares of Aztec Oil's Form S-8 free trading stock in return for legal services Sonfield provided to Aztec Oil as corporate counsel for Aztec Oil.  Based on the price at the time, this stock would have been worth approximately $13,400.

5.49    On June 16, 2005, Sonfield signed a resolution authorizing amendments to the stock option, stock warrant, and stock award plan of Aztec Oil to include an evergreen provision automatically increasing the number of available shares under the plan from time to time without further action by the Board of Directors or Shareholders of Aztec Oil.

5.50    Also on June 16, 2005, Sonfield signed a Post-Effective Registration Statement on Form S-8 which was filed with the SEC, as Attorney-In-Fact for Jefferson (as Chairman, President and Principal Executive Officer and Director), Monica Jefferson (as Secretary, Principal Accounting and Financial Officer and Director) and Terry Roberts (as Director), as well as providing the legal opinion associated with such filing.

### D.  Aztec Energy Formation and SEC De-registration

5.51    On August 14, 2006, Aztec Energy, LLC ("Aztec Energy") was formed in Nevada.  The manager listed on the formation documents is Aztec Oil.

5.52    Presently, Aztec Oil is 99% member of Aztec Energy.

5.53    On April 2, 2009, a resolution was passed to terminate Aztec Oil's filing obligations with the SEC.  Aztec Oil's common stock was previously registered with the SEC under Section 12(g) of the Securities Exchange Act of 1934, as amended.

5.54    Subsequently on April 8, 2009, Aztec Oil filed a Form 15 with the SEC terminating Aztec Oil's obligation to file reports with the SEC under Section 12(g).

5.55    Since de-registration in 2009, Aztec Oil's common stock has traded on the OTC markets, or pink sheets.

### E.  Fisher's Alleged Interest in Aztec Oil

#### Consulting Agreements

5.56    On July 22, 2004, Fisher's company, IFD, entered into a consulting agreement with Aztec Oil providing for payments between $10,000 and $15,000 a month until December 2014.  Fisher also received 6 million warrants to purchase shares of restricted common stock of Aztec Oil.  The 6 million warrants consisted of 1,500,000 warrants with the exercise price of $.75; 1,500,000 warrants with the exercise price of $1.00; 1,500,000 warrants with the exercise price of $1.25; and 1,500,000 warrants with the exercise price of $1.65.

5.57    This agreement was extended, and the warrants were favorably repriced for the benefit of IFD multiple times as the trading price of Aztec Oil's common stock declined and the warrants ended up "out of the money".  The agreement called for IFD to provide general consulting services for Aztec Oil's business development.

5.58    On June 15, 2007, a resolution was signed naming Fisher CEO and Chairman of Aztec Oil. Aztec Oil entered into an employment agreement with Fisher providing a base salary of $24,000, bonus opportunities, stock, and stock options.  This was in addition to

the compensation he was to receive through the consulting agreement. This agreement was subsequently amended on July 21, 2008 increasing Fisher's base salary to $144,000 per year.  The agreement was again amended less than four months later on November 10, 2008 increasing Fisher's base salary to $250,000 per year.  Despite Fisher's substantial compensation for his duties as CEO, Fisher continued to reap benefits from IFD's ongoing consulting agreement with Aztec Oil.  Simply put, Fisher received a double salary for performing the same job.

5.59    On January 28, 2010, simultaneously with Fisher's resignation as CEO and Chairman, Aztec Oil resolved, among other things, to enter into a consulting agreement with Fisher individually.  This agreement was in addition to the consulting agreement in effect with Fisher's company IFD.  The agreement provided for compensation in the amount of $15,000 a month payable either in cash, or at Fisher's election in stock valued at 75% of the trading price of the company's common stock.  The agreement states that Fisher is to provide expertise and experience on certain business and financial matters.

5.60    On November 29, 2010, despite having entered into a consulting agreement with Fisher earlier the same year, the board resolved to extend IFD's consulting agreement until 2017.  In the resolution, it is recognized that Fisher in fact is performing the same services under two separate agreements providing him double compensation.

5.61    Under the terms of these duplicative agreements which were extended and amended for the benefit of IFD and Fisher on numerous occasions, Fisher currently claims Aztec Oil owes approximately $2.6 million and claims he holds rightful title to 8 million warrants/options to purchase shares of Aztec Oil's restricted common stock.  The 8 million warrants/options Fisher claims he owns represent approximately 75% of the current outstanding share of stock for Aztec Oil.

*Stock*

5.62    In addition to the Series A Stock discussed above, Fisher frequently purchased Aztec Oil's common stock for practically no consideration, was granted stock options and stock in repayment for loans or other services, or received stock through transfers.  Fisher was then able to sell the common stock on the market for extraordinary profit.

5.63    For example, from the time period of January 1, 2004 to June 30, 2005, Fisher profited from sales of Aztec Oil's stock through the various entities he controlled in the amount of $4,068,798.  This enormous profit was realized within less than a year of the fraudulent merger of Aztec Oil.

5.64    Fisher pled guilty to an FBI obstruction of justice charge stemming from his conduct during an FBI investigation into allegations of securities fraud in February 2011. Fisher admitted that, from on or about September 2004, through on or about May 2005, he and Shelly S. Singhal ("Singhal"), a securities broker from Newport Beach, California and an investment advisor to Aztec Oil (also the principal of SBI which at one time held half of the outstanding Series A Stock shares described above), helped to pay for newsletters recommending the purchase of Aztec Oil shares. The newsletters contained false and misleading disclaimers, purportedly paid for by "a non-affiliated third party," Bedford Proprietary Trading, LLC. Bedford Proprietary Trading was a conduit used to receive cash payments directly and indirectly from Singhal, Fisher, and others to pay for the newsletters recommending the purchase of Aztec Oil shares. Fisher and Singhal, after the newsletters were disseminated to the investing public, each caused Aztec Oil shares to be sold to the investing public.

5.65    In April 2010, Singhal was indicted on three counts for his alleged

involvement in the conspiracy and scheme to defraud the investing public through the use of stock manipulation schemes, including a scheme referred to as "scalping." One of the scalping schemes alleged in the indictment involved the promotional campaign related to the Aztec Oil shares. The indictment charged that Singhal and others fraudulently obtained at least $10 million in proceeds through the scheme to defraud by artificially increasing the demand for shares, through these newsletters, of three companies that they controlled, including Aztec Oil.

### Royalty Interest

5.66    On December 4, 2006, Fisher also received a 2% overriding royalty interest in all individual leases, wells or well sites assigned or acquired by Aztec Oil or its affiliates in the Appalachian Basin.  The stated reason for the excessive grant, was that Fisher, through his company CSI Energy, LP, guaranteed to Aztec Oil's auditors that funds would be provided to cover Aztec Oil's monthly operating costs and other obligations in the event of a shortfall, which never occurred.  CSI Energy never required to pledge collateral or assets of any kind as part of this "guarantee".

5.67    Additionally, on June 15, 2007, presumably at the direction of Fisher, Aztec Oil, pursuant to minutes of the board of directors, renounced any rights to any opportunities presented to Fisher or which Fisher became aware of notwithstanding the fact that he was CEO and Chairman and had a fiduciary obligation to Aztec Oil.

5.68    The benefits Fisher received both as CEO and as President of IFD, were egregious in light of the financial condition of Aztec Oil.

### Fisher's Legal Expenses

5.69    As described above, From July 2004 to May 2005, Fisher was involved in a scheme to market Aztec Oil stock also involving SBI and its owner, Singhal.  Fisher had

partly funded the scheme and knew that it did not comply with applicable securities regulations.  Because of these illegal activities, Fisher, along with his company Pragmatica and others, ultimately received a subpoena from the Department of Justice on March 20, 2008.

5.70     During interviews conducted as part of a grand jury investigation, Fisher knowingly gave false and misleading statements to FBI agents and prosecutors from the United States Attorney's office regarding his knowledge of these activities.  Fisher was subsequently charged with obstruction of justice.  As a result of this subpoena and his false testimony, Fisher incurred substantial legal fees.

5.71     On January 25, 2010, Fisher purportedly demanded payment from his subordinate, Waylan Johnson the then, President of Aztec Oil for his legal fees.  Fisher never demanded or requested payment from Aztec Oil's directors.  Fisher relied on an indemnity provision in the consulting agreement executed on July 22, 2004 between Aztec Oil and IFD as the basis for his demand.   However, the indemnification provision was not valid for criminal acts of Fisher.  Fisher himself stated in writing to third parties that the DOJ action against himself was entirely unrelated to Aztec Oil.  Despite this admission, Fisher sought reimbursement from Aztec.  Authorization to reimburse Fisher under the indemnification provision was never granted.

5.72     On February 22, 2011, Fisher pled guilty to obstruction of justice in return for reduction of the charges and possible sentence to be levied against him.  Around this time, Fisher voluntarily forfeited his license to practice law in Texas.

5.73     It was not discovered until May 2013 that Fisher did in fact unilaterally authorize the use of Aztec Oil's funds to pay for his defense and reimbursement of prior expenses without Board of Directors approval and without advising anyone with Aztec Oil

of such actions.  In fact, on May 24, 2013, then President of Aztec Oil, Waylan Johnson, emailed counsel questioning whether the payments were proper.

5.74    On June 10, 2013, less than three weeks later, a resolution was passed by the Board of Directors of Aztec Oil terminating Waylan Johnson "for cause."

5.75    Aztec Oil remains unreimbursed for a sum totaling nearly $1,000,000 in legal fees.

### F.  Current Status

5.76    On March 13, 2014, a resolution was passed by the Board of Directors appointing Jeremy Driver ("Driver") as President of Aztec Oil.  As part of his role as President and in an effort to secure Aztec Oil financially, Driver began to take steps in preparation of filing a new registration statement with the SEC which would allow Aztec Oil to be a reporting company again.  As part of this process, it became clear to him that Aztec Oil's formation was suspect as well as its prior disclosures as reported with the SEC.

5.77    Driver took action to bring the events to the attention of the board of directors in order to remove the fraudulent actors from all company dealings and protect the substantial investments made by unsuspecting investors.

## 6.  CLAIMS AGAINST FRANK FISHER

### A.  Violation of Federal Securities Laws

6.1    Plaintiffs incorporate all proceeding paragraphs.

6.2    Fisher was a licensed attorney in the State of Texas during all of the time periods above, and the Chief Executive Officer and Chairman of Aztec Oil from June 15, 2007 to February 2, 2010 (a reporting company with the SEC), and knew or should have known applicable filing and disclosure requirements.

6.3    On April 8, 2009, Aztec Oil filed a Form 15 with the SEC terminating the

requirement that it file reports with the SEC pursuant to Section 13 or 15(d) of the Exchange Act. From June 15, 2007 to April 8, 2009, Aztec Oil filed various Form 8-Ks, Form 10-QSB Quarterly Reports and Form 10-KSB Annual Reports with the SEC which Fisher signed and approved as Chief Executive Officer and Principal Executive Officer (collectively, the "Periodic Reports").

6.4    Fisher knew or should have known upon the filing of each report, that Aztec Oil was dissolved in Utah, and therefore that the actual public reporting "company" did not exist under corporate law, and as such, each filing was in of itself false and misleading on that basis alone and/or because it failed to report that fact, which made the filing false and misleading on its face.

6.5    Fisher provided a certification on each quarterly and annual report (each Form 10-QSB and Form 10-KSB) filed by Aztec Oil during the period he served as Principal Executive Officer under Section 302 and Section 906 of The Sarbanes-Oxley Act of 2002 (the "Sarbanes Oxley Act").

6.6    The certification made under Section 302 of the Sarbanes Oxley Act states in part that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the] report."

6.7    Due to the issues associated with Aztec Communications' dissolution with the State of Utah and the fact that the merger between Aztec Communications Utah and Nevada was not valid, such Section 302 certifications were false and misleading and violated Section 302 of the Sarbanes Oxley Act.

6.8    The certifications made by Fisher as Principal Executive Officer pursuant to

Section 906 of the Sarbanes Oxley Act in the Periodic Reports, certified that the information contained in such periodic reports "fairly presents in all material respects the financial condition and results of operations of" Aztec Oil. Due to the matters described above, which Fisher was aware of and had knowledge of, such Periodic Reports and the information contained therein was misleading and inaccurate. As such Fisher violated Section 906 of the Sarbanes Oxley Act.

6.9     Additionally, Fisher is the purported holder of all the alleged Series A Stock shares.  At no time between June 11, 2004 (when the Series A Stock shares were originally issued) through the current date have any of Aztec Oil's SEC filings mentioned who the beneficial owner of the Series A Stock is.  As the Series A Stock holders control 70% of the voting power of the company, such disclosure is material information which company shareholders should have been made aware of pursuant to the requirements of Regulation S-K.

6.10    Sonfield and Fisher were responsible for preparing and filing those SEC filings and included no disclosure of the beneficial owner of such Series A Stock shares, even when such Series A Stock shares were beneficially owned and controlled by Sonfield through the Livingston Growth Fund Trust, of which Sonfield is the trustee and Fisher is the owner.

6.11    The filings also fail to include outstanding warrants and options in such beneficial ownership as required for any security which can be obtained within 60 days of the applicable date pursuant to SEC requirements.  As a result, Fisher's ownership as reported by himself in such Aztec Oil SEC filings significantly understates and misstates his actual beneficial ownership of Aztec Oil securities.  The warrants and options were subsequently changed to make them exercisable only after 60 days to in an attempt to circumvent this provision.

6.12    None of the previously filed annual reports of Aztec Oil include the voting rights of the Series A Stock in the beneficial ownership table.  Instead almost all of the annual reports include a generic footnote at the bottom of the required beneficial ownership table discussing that Aztec Oil has Series A Stock outstanding which votes 70% of the outstanding voting stock without any mention of who owns or votes the stock as required by applicable SEC rules and regulations.

6.13    Fisher, who owns most of the stock, warrants and options listed above, ensured that the filings omitted this information, with the aid of Sonfield, in order to hide his fraudulent acts and alleged control of Aztec Oil.

6.14    From June 2004 until December 2004[2], IFD, and Fisher as a result of his ownership of IFD, were greater than 10% shareholders of Aztec Oil, as Fisher had the right to acquire beneficial ownership of 6 million shares of common stock of Aztec Oil constituting more than then 10% of Aztec Oil's then outstanding shares (which were between 7 million and 24 million shares during those periods).

6.15    As a greater than 10% shareholder of Aztec Oil, Fisher had an obligation under Section 16 of the Exchange Act to file reports with the SEC disclosing his beneficial ownership on Form 3, 4 and where applicable Form 5. Furthermore, as a greater than 5% shareholder of Aztec Oil, Fisher had an obligation to file a Schedule 13D (or if certain criteria for ownership were met, Schedule 13G).

6.16    Fisher only filed a Form 3 in May 2007, when he reported ownership of 9.9 million shares of common stock (without disclosing any ownership of Series A Stock).

---

[2]    December 2004 was when the IFD warrants were amended to require the holder to provide at least 65 days prior written notice for exercises and to provide for a mechanism to re-price (to lower the exercise price) of such warrants.  These changes in terms and re-pricing was never disclosed in Aztec Oil's SEC filings.

Fisher first filed a Schedule 13D on May 3, 2007.  Fisher's trust, Livingston, additionally failed to file a Schedule 13D.  The failure to file required ownership reports under Section 16 and Rule 13d-1 of the Exchange Act constituted a violation of Section 16(a) of the Exchange Act and Rule 13d-1 thereunder.

6.17    Also, the Periodic Reports filed by Aztec Oil (including the beneficial ownership tables included therein, which are required to include all securities owned or which each holder has the right to acquire within 60 days) never included Fisher's nor Livingston's beneficial ownership of warrants or options, which makes such reports materially misleading.

6.18    None of the Periodic Reports filed by Aztec Oil during the period which Fisher served as Principal Executive Officer included the required disclosures under the "unregistered sale of equity securities" of such reports. Almost all of such reports failed to include any information regarding "unregistered sales of equity securities" even though such information is required to be included by Form 10-Q/Form 10-QSB and Form 10-K/10-KSB.  Where such information was included, the disclosure left out the required information regarding what exemption from registration under the Securities Act Aztec Oil relied upon for such issuances, as required by Regulation S-K. As such, all of such reports were deficient.

6.19    On June 15, 2007, Aztec Oil entered into an employment agreement with Fisher to serve as the Chief Executive Officer of Aztec Oil.  On July 21, 2007 and November 10, 2007, Fisher's compensation was increased under the employment agreement.  Aztec Oil had an obligation to disclose these transactions under Item 502(e) of Regulation S-K as promulgated by the SEC, which requires disclosure of the entry into and material terms of any executive employment agreement or material modification thereof.  No Form 8-K's

were filed by Aztec Oil.

6.20    Additionally, under applicable Form 8-K rules and Item 601 of Regulation S-K, there was an obligation for Aztec Oil to file these agreements and amendments as exhibits to Aztec Oil's periodic reports with the SEC and no such filings were ever made. The failure to file required Form 8-Ks and to include disclosure of material agreements constituted a violation of Section 13(a) of the Exchange Act. Additionally, as the failure to disclose related specifically to Fisher's own agreements and because he was Chief Executive Officer of Aztec Oil at that time, he had a specific obligation to confirm that all required SEC disclosures were made.

6.21    Due to the material omissions and false and misleading statements described above, Fisher violated: (i) Rule 12b-20 of the Exchange Act, which requires that "[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading"; (ii) Section 10(b) of the Exchange Act, which states that it is unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors"; and (iii) Rule 10b-5 of the Exchange Act, which makes it unlawful to: "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order

to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Such material misstatements and omissions also constituted fraud.

6.22    On January 28, 2010, Aztec Oil entered into a new consulting agreement with Fisher. Shares of Form S-8 stock were issuable to Fisher in connection with the agreement. Fisher's July 22, 2004 consulting agreement required that Aztec Oil pay him a 5% commission on payments received for introductions made to the company by Fisher.  As Fisher was not registered as a broker/dealer under applicable laws, such provision resulted in a violation of Section 15(b) of the Securities Act which requires all persons acting as a broker or dealer, subject to certain exceptions not applicable here, to register as a broker or dealer with the SEC.

6.23    These actions and violations stated above constitute omissions and misrepresentations, actionable under Section 10(b) of the Securities and Exchange Act of 1934 and under 17 C.F.R. Section 240.10b-5.   Plaintiffs relied on Fisher's actions and statements and are damaged as a result of theses misrepresentations and omissions.

### B.  Breach of Fiduciary Duty

6.24    Plaintiffs incorporate all proceeding paragraphs by reference.

6.25    Fisher had a fiduciary duty with Aztec Oil as CEO and Chairman of Aztec Oil.

6.26    Fisher breached his fiduciary duty of the utmost good faith in his relations with Aztec Oil and duty of loyalty by self dealing when he was CEO of Aztec Oil.

6.27    Fisher breached his fiduciary duty owed to Aztec Oil when he repeatedly violated applicable Securities regulations, described above, while CEO of Aztec Oil.

6.28    Fisher knew that he was receiving double compensation for performing the same work.  Fisher was compensated once as CEO and again as President of IFD who was "consulting" for the company.  As part of these agreements, Fisher was awarded stock options and warrants which eventually became "out of the money."

6.29    As a result of this self dealing, Fisher claims Aztec Oil owes approximately $2.6 million and claims he holds rightful title to 8 million warrants/options to purchase shares of Aztec Oil's restricted common stock.

6.30    Additionally, Fisher frequently purchased Aztec Oil's common stock for practically no consideration, was granted stock options and stock in repayment for loans or other services, or received stock through transfers.  Fisher was then able to sell the common stock on the market for extraordinary profit.  From the time period of January 1, 2004 to June 30, 2005, Fisher profited from sales of Aztec Oil's stock through the various entities he controlled in the amount of $4,068,798.  This enormous profit was realized within less than a year of the fraudulent merger of Aztec Oil.

6.31    Further, Fisher received a 2% overriding royalty interest in all individual leases, wells or well sites assigned or acquired by Aztec Oil or its affiliates in the Appalachian Basin in return for his company, CSI Energy, LP's, mere promise to guarantee any potential shortfall for Aztec Oil's auditors.  CSI Energy, LP was never required to pledge any assets.  This award was grossly inappropriate considering Aztec Oil's assets and position.

6.32    While CEO of Aztec Oil, Fisher had Aztec Oil formally renounce any rights and opportunities presented to Fisher of which Fisher became aware of notwithstanding the fact that he was CEO and had a fiduciary obligation to Aztec Oil.

6.33    Aztec Oil has been harmed by Fisher's breaches of fiduciary duties owed to

Aztec Oil and damaged in the amounts impermissibly gained by Fisher's self dealing including the stock shares, options, and warrants allegedly granted to Fisher.

### C. Fraud

6.34    Plaintiffs incorporate all proceeding paragraphs by reference.

6.35    Fisher made multiple misrepresentations and omissions to Aztec Oil.

6.36    Fisher failed to inform Aztec Oil that the Series A Stock issued would end up under his control.  As shown above, Fisher alleges control of the Series A Stock.  Fisher ensured that the transaction was structured so that his ownership was not evident.  However, mere days after it was issued, the Series A Stock was transferred to Swiss companies.  Ultimately, the Series A Stock was entirely controlled by Fisher.

6.37    Fisher also represented to Aztec Oil that he was entitled to the nearly $1,000,000 in funds he took from the company to pay his legal expenses surrounding the plea deal he made with the Department of Justice.

6.38    Additionally, Fisher represented to Aztec Energy that Aztec Oil, the parent company, was a merged company that was free of the very problems Fisher brought upon it.

6.39    These representations were material because they affected the operation of Aztec Oil and Aztec Energy and the validity of their actions.  These representations were also the basis upon which Aztec Oil and Aztec Energy incurred debts, sold stock, and transacted with Fisher.

6.40    Fisher made the representations or omissions knowing they were false.

6.41    Aztec Oil and Aztec Energy justifiably relied on the representations.

6.42    Fisher's representations directly and proximately caused injury to Aztec Oil which resulted in damages including the money wrongfully taken to fund his legal defense.

### D.  Aiding and Abetting Fraud

6.43    Plaintiffs incorporate all proceeding paragraphs by reference.

6.44    Fisher was aware of the fraudulent acts occurring. Fisher gave substantial aid and assistance in effecting the fraud by covering up the others' misrepresentations.

6.45    Fisher financially supported Sonfield's and Jefferson's actions to perpetuate an invalid merger.  Fisher assisted Sonfield in structuring the purported Series A Stock so that Fisher might gain control.

6.46    His assistance and participation, separate from Sonfield's and Jefferson's acts, breached their duty to Aztec Oil.

6.47    Fisher's assistance and participation was a substantial factor in causing the fraud, a result of which Aztec Oil was harmed.

### E.  Aiding and Abetting Breach of Fiduciary Duty

6.48    Plaintiffs incorporate all proceeding paragraphs by reference.

6.49    Fisher was aware of the breaches of fiduciary duty occurring. Fisher gave substantial aid and assistance in effecting the breaches of fiduciary duty.

6.50    Fisher, as stated above, financially supported Sonfield's and Jefferson's actions to perpetuate an invalid merger.

6.51    His assistance and participation, separate from Sonfield's and Jefferson's acts, breached their duty to Aztec Oil.

6.52    Fisher's assistance and participation was a substantial factor in causing the breaches of fiduciary duty.

### F.  Conspiracy

6.53    Plaintiffs incorporate all proceeding paragraphs by reference.

6.54    Jefferson, Sonfield, and Fisher acted together in violating federal securities

laws, and accomplishing the fraud and breaches of fiduciary duty on Aztec Oil.

6.55    As shown above, Jefferson, Sonfield and Fisher acted together to perpetuate the invalid merger with the Utah Aztec Communications.  Additionally, Jefferson, Sonfield and Fisher acted together to issue invalid stock and ensure that accurate reporting was not made so that their acts would remain hidden.

6.56    As a result of their conspiracy, Aztec Oil was harmed and suffered damages.

## 7. CLAIMS AGAINST ROBERT SONFIELD

### A.  *Violation of Federal Securities Laws*

7.1    As a result of the August 2004 Power-of-Attorney ("POA") the Board of Directors of Aztec Oil attempted to provide to Sonfield, and the actions purportedly taken by Sonfield pursuant to the power provided to him under the POA, Sonfield immediately became (a) subject to Section 16 reporting under the Exchange Act upon receipt of the POA, because he became the de facto Board of Directors of Aztec Oil (and in fact did sign multiple documents, agreements and filings after that seemingly unilaterally in the name of the Board of Directors); and (b) subject to Rule 144 of the Securities Act in connection with any sales of shares received in Aztec Oil (because of being a "director" and therefore an "affiliate" of Aztec Oil) under Rule 144.

7.2    Because Sonfield was subject to Section 16 of the Exchange Act, he had an obligation to file a Form 3 (reporting his initial beneficial ownership in Aztec Oil) within 10 days of the date he became subject to Section 16 (which date was at least as early as July 28, 2007), and would have been required to file Form 4s (reporting any changes in his beneficial ownership) whenever he acquired or sold shares.[3]  However, no such reports were ever filed. The failure to file such reports constituted a violation of Section 16(a) of the

---

[3]     Such reports are due within 2 days of each change in beneficial ownership.

Exchange Act.

7.3      Once subject to Rule 144 of the Securities, Sonfield would have had an obligation to sell any shares he received from Aztec Oil pursuant to Rule 144 of the Securities Act (regardless of whether the issuance of those shares were registered on a Form S-8 or not). For "affiliates" to legally sell under Rule 144, that requires among other things, that such "affiliates" file a notice filing on Form 144 with the Securities and Exchange Commission prior to making any sales. Aztec has no knowledge of any Form 144's ever being filed by Sonfield and assuming such Form 144's were not filed, any sales of Aztec Oil common stock after at least July 18, 2007 would not be eligible to be sold under Rule 144, and would therefore have been sold by Sonfield in violation of Section 5 of the Securities Act.

7.4      Sonfield signed a July 18, 2007 consent to action as the Trustee of the Livingston Growth Fund Trust.  The consent stated that such Trust, owned by Fisher, held all 100% of the outstanding Series A Stock shares which voted 70% of the shareholder vote on all shareholder matters of Aztec Oil. No disclosure of Sonfield's beneficial ownership was included in any of Aztec Oil's Form 10-K filings, as required by Item 403 of Regulation S-K, or any Schedule 13D ownership reports filed by the Livingston Growth Trust with the SEC, as required by applicable rules. The failure to disclose such ownership constituted a violation of Section 16(a) of the Exchange Act and Rule 13d-1 thereunder.

7.5      Item 403 of Regulation S-K requires in the "Security Ownership of Certain Beneficial Owners and Management" table required in a Form 10-K/KSB, the disclosure of "any person (including any "group" as that term is used in Section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities" (emphasis added).

7.6     As Aztec Oil's annual reports fail to include the name and address of the holders of the Series A Stock (including Sonfield, Fisher, the Livingston Growth Trust, and anyone else who ever beneficially owned such Series A Stock), such annual report filings are deficient and materially misleading.  The most important disclosure to a reader of Aztec Oil's annual reports is the name of the shareholder or shareholders who hold 70% voting power of the company.  As Fisher signed off on the Form 10-KSB annual report for the year ended December 31, 2008, and Sonfield assisted with the drafting and preparation of all annual reports from 2000 to 2009, such individuals knew such reports and such disclosures therein were deficient.  As such, Fisher and Sonfield violated (i) Rule 12b-20 of the Exchange Act; (ii) Section 10(b) of the Exchange Act; and (iii) Rule 10b-5 of the Exchange Act.

7.7     Sonfield also filed an Amended Form S-8 Registration Statement on behalf of Aztec Oil on June 16, 2005, signing such filing on behalf of and as attorney-in-fact for each officer of Aztec Oil and the entire Board of Directors. Section 6(a) of the Securities Act makes clear that a registration statement filed under the Securities Act shall be signed by several persons, including certain officers and directors of the issuer.

7.8     The SEC has provided further no action guidance (Allied Corporation (dated July 21, 1982)) that the "signature requirement is intended, among other things, to impress upon the persons who must sign their responsibility for the disclosures made in the registration statement and to assure that they are liable for such disclosures. It does not seem that the use of a general power of attorney . . . would promote these purposes. As a consequence, it is our view that such a broad power of attorney would be inappropriate under the [Securities] Act."

7.9     As a result, the Amended Form S-8 was invalid because it wasn't properly and

legally signed by the principal executive officer, principal financial officer and at least a majority of the Board of Directors of Aztec Oil (as required by Section 6(a) of the Exchange Act).  Consequently any shares of common stock issued under that amended Form S-8 would be issued in violation of Section 5 of the Securities Act.  Furthermore, the sale of such Form S-8 stock by Sonfield and Fisher constituted a violation of Section 5 of the Securities Act.

  7.10 Such false and deceptive registration statement also constituted a violation of Sections 11, 12(a)(2) and 15 of the Securities Act, which governs the use of  false and misleading statements in registration statements and prospectuses, as such registration statement failed to include disclosure (either on its face or as incorporated by reference) of the fact that Aztec Oil was dissolved in Utah and therefore that the actual public reporting "company" did not exist under corporate law, and the fact that the merger between the Utah company and the Nevada company was not valid.

  7.11 None of the Form 8-Ks, Form 10-Q's/QSB's and Form 10-K's/KSB's filed by Aztec Oil during the period which Sonfield served as securities counsel included the required disclosures under the "Recent Sale of Unregistered Securities" section of such reports as required by Item 701 of Regulation S-K. Almost all of such reports failed to include any information regarding "Recent Sale of Unregistered Securities" even though such information is required to be included by Form 10-Q/Form 10-QSB and Form 10-K/10-KSB; provided that where such information was included the disclosure was deficient and left out the required information regarding what exemption from registration under the Securities Act Aztec Oil relied upon for such issuances, which disclosure is required by Regulation S-K. As such, all of such reports were deficient and did not include the information required by applicable law.

7.12    None of the Form 8-K's filed by Aztec Oil during the period which Sonfield served as securities counsel for Aztec Oil disclosing appointments of officers or directors included any biographical information for such newly appointed individuals (which is required for at least the past five years pursuant to Form 8-K and Item 401 of Regulation S-K). Furthermore, none of such filings included disclosures of related party transactions between the newly appointed individuals and Aztec Oil, which is similarly required pursuant to Item 404 of Regulation S-K and the Form 8-K rules.

7.13    For example, the Form 8-K dated June 15, 2007, relating to the appointment of Fisher as Principal Executive Officer, failed to disclose Fisher's control over the voting stock of Aztec Oil, include his biographical information or any other related party transactions including the consulting agreement and warrants. As such, these filings were materially deficient and violated Section 13(a) of the Exchange Act and the disclosure requirements of Form 8-K, which reference Item 401 of Regulation S-K.

7.14    In order for an individual to legally sell shares obtained under a Form S-8 Registration Statement pursuant to such Form S-8 registration statement and without further registration and without selling pursuant to an exemption from registration, an issuer has to provide each eligible person (potential seller) a copy of a separate Form S-8 prospectus.[4]

7.15    The Form S-8 Registration Statements filed by Aztec Oil on June 3, 2004 and June 16, 2005, include a representation that "[t]he documents containing the information specified in [Part I of Form S-8] will be sent or given to participants in the 2004 Directors, Officers and Consultants Stock Option, Stock Warrant and Stock Award Plan (the "Plan)

---

[4]    This prospectus is not filed with the SEC, but is prepared internally and includes certain disclosures about the issuer's securities as required by Part I of Form S-8.

[sic] as specified by Rule 428(b)(1). Pursuant to the instructions for Form S-8, such documents need not be filed with the Commission either as part of the Registration Statement or as prospectuses or prospectus supplements pursuant to Rule 424. These documents and the documents incorporated by reference in this Registration Statement pursuant to Item 3 of Part II of this Registration Statement, taken together, constitute a prospectus that meets the requirements of Section 10(a) of the Securities Act of 1933, as amended. See Rule 428(a)(1)."

7.16    Aztec Oil is not aware of any Form S-8 prospectus being delivered to shareholders of Aztec Oil (including Sonfield and Fisher) and the failure to comply with that delivery requirement means that the Form S-8 was deficient and all sales of Form S-8 shares by shareholders of Aztec Oil, including Sonfield, violated Section 5 of the Securities Act.  None of Aztec Oil's annual reports on Form 10-KSB as filed on Edgar for the periods ended December 31, 2002, 2003, 2004 and 2005 include any information regarding Section 16 reporting.[5]   As such, those annual reports are deficient and materially misleading.

7.17    These actions and violations stated above constitute omissions and misrepresentations, actionable under Section 10(b) of the Securities and Exchange Act of 1934 and under 17 C.F.R. Section 240.10b-5.   Plaintiffs relied on Sonfield's actions and statements and are damaged as a result of theses misrepresentations and omissions.

## B.  Breach of Fiduciary Duty

7.18    Plaintiffs incorporate all proceeding paragraphs by reference.

7.19    Sonfield has a fiduciary duty with Aztec Oil as legal counsel.

---

[5]    The reports are required to state whether any late reports were filed and instead they simply disclose the filing obligations of Section 16 reporting persons.

7.20    Sonfield breached his fiduciary duty by failing to represent Aztec Oil with undivided loyalty; failing to act with absolute perfect candor, openness, and honesty, and without concealment or deception; failing to refrain from self dealing; failing to inform Aztec Oil of matters material to the representation; and failing to inform Aztec Oil of conflicts of interest.

7.21    Specifically, on numerous occasions Sonfield was  issued Form S-8 free trading stock.  Several times this stock was issued on his own authority while Sonfield was purporting to act as attorney-in-fact for the board of directors.  In fact, Sonfield signed the invalid Form S-8 pursuant to which the Form S-8 stock was granted and provided the legal opinion in connection with such Form S-8.

7.22    Sonfield also breached his fiduciary duty to the company by committing the various SEC violations as detailed above.

7.23    Additionally, Sonfield breached his fiduciary duty to Aztec Oil when he held himself out as a valid attorney-in-fact for the directors.  Sonfield knew that he could not act as attorney-in-fact for directors of a corporation as directors cannot delegate their duties.

7.24    Sonfield's breaches of fiduciary duty injured Aztec Oil resulting in damages.  These damages include the amounts impermissibly gained by Sonfield's self dealing including the stock shares, options, and warrants allegedly granted to either himself or to Fisher.  Further, Sonfield's acts regarding the impermissible merger with Utah Aztec Communications have cost Aztec Oil substantial legal fees in its efforts to effectively trade publicly again.

### C. Fraud

7.25    Plaintiffs incorporate all proceeding paragraphs by reference.

7.26    Sonfield represented to Aztec Oil that the merger with Utah was effective.  As legal counsel, Sonfield knew that the merger was ineffective.  Sonfield knew that Utah rejected all attempts to revive Aztec Communications.

7.27    Sonfield represented that Aztec Oil could validly trade on the public markets when in fact, Aztec Oil was never merged with a publicly trading company.  Aztec Oil relied on these representations when it traded stock and conducted business as an entity merged with Aztec Communications.

7.28    Sonfield failed to tell Aztec Oil that the Series A Stock was being issued in a way which allowed Fisher to ultimately gain complete voting control of Aztec Oil.  Aztec relied on this omission when it issued the Series A Stock.

7.29    Sonfield represented to Aztec Oil that he could act as power of attorney for the directors.  Directors, cannot delegate their duties owed to a corporation to a power of attorney.  However, Sonfield, for nearly a year, represented that he was validly acting as power of attorney for the directors of Aztec Oil.  During this time period, Sonfield unilaterally signed multiple resolutions, many directly benefitting himself.  Aztec Oil relied on this misrepresentation and is damaged as a result.

7.30    Sonfield represented to Aztec Oil that he was properly filing the required forms and documents for Aztec Oil.  As shown above, Sonfield either failed to file or filed documents insufficient under the regulations.  Aztec Oil relied on Sonfield's representations as legal counsel.  Sonfield's failure to follow the applicable SEC requirements has resulted in damages to Aztec.

7.31    Additionally, Sonfield represented to Aztec Energy, that Aztec Oil, the parent company, was a merged company that was free of the very problems Sonfield brought upon

it.

7.32     Sonfield made the representations or omissions knowing they were false.

7.33     Aztec Oil and Aztec Energy justifiably relied on the representations.

7.34     Sonfield's representations directly and proximately caused injury to Aztec Oil which resulted in damages.

### D.  Aiding and Abetting Fraud

7.35     Plaintiffs incorporate all proceeding paragraphs by reference.

7.36     Sonfield was aware of the fraudulent acts occurring. Sonfield gave substantial aid and assistance in effecting the fraud by covering up and perpetuating Jefferson's and Fisher's misrepresentations.

7.37     His assistance and participation, separate from Fisher's and Jefferson's acts, contributed to the fraud on Aztec Oil.

7.38     Sonfield's assistance and participation was a substantial factor in causing the fraud.

### E.  Aiding and Abetting Breach of Fiduciary Duty

7.39     Plaintiffs incorporate all proceeding paragraphs by reference.

7.40     Sonfield was aware of the breaches of fiduciary duty occurring.  Sonfield, as legal counsel, new that Fisher's acts constituted self dealing.  Sonfield also knew that Jefferson could not delegate his duties owed to Aztec Oil by appointing Sonfield as his attorney-in-fact.  Sonfield gave substantial aid and assistance in effecting the breaches of fiduciary duty.

7.41     His assistance and participation, separate from Fisher's and Jefferson's acts, breached his duty to Aztec Oil.

7.42     Sonfield's assistance and participation was a substantial factor in causing the breaches of fiduciary duty.

### F.  Conspiracy

7.43     Plaintiffs incorporate all proceeding paragraphs by reference.

7.44     Jefferson, Sonfield, and Fisher acted together in violating federal securities laws, and accomplishing the fraud and breaches of fiduciary duty on Aztec Oil.

7.45     As a result of their conspiracy, Aztec Oil was harmed and suffered damages.

### G.  Legal Malpractice

7.46     Plaintiffs incorporate all proceeding paragraphs by reference.

7.47     Aztec Oil and Sonfield had an attorney-client relationship.

7.48     Sonfield breached the standard of care that arose from the attorney-client relationship by failing to properly file required forms and documents; assuming a legally ineffective power of attorney; self dealing by issuing himself stock; and representing that Aztec Oil was validly merged with Aztec Communications when it was not.

7.49     Defendants breach resulted in injury to Aztec Oil which resulted in damages including the attorney's fees spent in bringing this suit.

### H.  DTPA

7.50     Aztec Oil is a consumer.

7.51     Sonfield can be sued under the DTPA.

7.52     Sonfield violated the DTPA by engaging in an unconscionable course of action when he represented that Aztec Oil was merged into Aztec Communications; when he represented that Aztec was a validly traded company; and when he represented that Aztec Oil was in compliance with reporting requirements.

---

7.53     Sonfield acted knowingly and intentionally, which entitles Aztec Oil to recover treble economic damages under Texas Business and Commerce Code section 17.50(b)(1). Aztec Oil is entitled to recover reasonable and necessary attorneys fees for prosecuting this suit under Section 17.50(d).

## 8.  CLAIMS AGAINST L. MYCHAL JEFFERSON, II

### A.  Violation of Federal Securities Laws

8.1     Plaintiffs incorporate all proceeding paragraphs.

8.2     The Articles of Merger filed by Aztec Communications with the Secretary of State of Nevada on April 20, 2004.  They were signed by Jefferson as a purported authorized officer of Aztec Communications. All filings made with the Secretary of State of Nevada on behalf of a Nevada corporation require a signature of an officer and require such officer to make representations regarding the fact that such information in the filing is correct.   Jefferson signed the Articles of Merger.  Because Jefferson knew that Aztec Communications was actually dissolved and not a valid corporation, he is subject to perjury in Nevada. Specifically, under Nevada Revised Statutes Section 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing with the Secretary of State of Nevada.

8.3     Jefferson signed various periodic reports (Forms 10-KSB and 10-QSB) which were filed with the SEC on behalf of Aztec Oil from October 2000 to August 2005. Jefferson knew upon the filing of each report, that Aztec Oil was dissolved in Utah and therefore, that the actual public reporting "company" did not exist under corporate law.  As such, each filing was in of itself false and misleading on that basis alone and/or because it failed to report that fact, which made the filing false and misleading on its face.

8.4     Due to such material omissions and false and misleading statements, Jefferson violated (i) Rule 12b-20 of the Exchange Act , which requires that "[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading"; (ii) Section 10(b) of the Exchange Act, which states that it is unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors"; and (iii) Rule 10b-5 of the Exchange Act, which makes it unlawful to: "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Such material misstatements and omissions also constituted fraud.

8.5     These actions and violations stated above constitute omissions and misrepresentations, actionable under Section 10(b) of the Securities and Exchange Act of 1934 and under 17 C.F.R. Section 240.10b-5.   Plaintiffs relied on Jefferson's actions and

statements and are damaged as a result of theses misrepresentations and omissions.

### B.  Breach of Fiduciary Duty

8.6     Plaintiffs incorporate all proceeding paragraphs by reference.

8.7     Jefferson had a fiduciary duty to Aztec Oil as a director of Aztec Oil.

8.8     Jefferson breached his fiduciary duty by concealing and misrepresenting that the merger was invalid.

8.9     Jefferson breached his fiduciary duty by delegating his duties as director when he gave Sonfield a power of attorney to make decisions for Aztec Oil on Fisher's behalf.

8.10     Jefferson breached his fiduciary duty by forming the Series A Stock and allowing Fisher to obtain total control.

8.11     These breaches have caused Aztec Oil damages including attorney's fees spent in an effort to allow Aztec Oil to publicly trade again.

### C.  Fraud

8.12     Plaintiffs incorporate all proceeding paragraphs by reference.

8.13     Jefferson represented to Aztec Oil that the merger with Utah was effective; that he was President of Aztec Communications.

8.14     Jefferson made the representations or omissions knowing they were false.

8.15     Aztec Oil and Aztec Energy justifiably relied on the representations.

8.16     Jefferson's representations directly and proximately caused injury to Aztec Oil which resulted in damages.

### D.  Aiding and Abetting Fraud

8.17     Plaintiffs incorporate all proceeding paragraphs by reference.

8.18     Jefferson was aware of the fraudulent acts occurring. Jefferson gave

substantial aid and assistance in effecting the fraud by covering up the others' misrepresentations.

8.19    His assistance and participation, separate from Sonfield's, Fisher's and Jefferson's acts, contributed to the fraud on Aztec Oil.

8.20    Jefferson's assistance and participation was a substantial factor in causing the fraud.

### E.  Aiding and Abetting Breach of Fiduciary Duty

8.21    Plaintiffs incorporate all proceeding paragraphs by reference.

8.22    Jefferson was aware of the breaches of fiduciary duty occurring. Jefferson gave substantial aid and assistance in effecting the breaches of fiduciary duty.

8.23    Jefferson's assistance and participation, separate from Sonfield's, Fisher's and Jefferson's acts, breached his duty to Aztec Oil.

8.24    Jefferson's assistance and participation was a substantial factor in causing the breaches of fiduciary duty.

### F.  Conspiracy

8.25    Plaintiffs incorporate all proceeding paragraphs by reference.

8.26    Jefferson, Sonfield, and Fisher acted together in violating Federal securities laws, and accomplishing the fraud and breaches of fiduciary duty on Aztec Oil.

8.27    As a result of their conspiracy, Aztec Oil was harmed and suffered damages.

## 9.  DAMAGES

9.1    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages within the jurisdiction of this Court.

## 10.  <u>REQUEST FOR TRIAL BY JURY</u>

10.1    Plaintiffs demand a trial by jury on every issue triable of right by a jury.

## 11.  <u>PRAYER FOR RELIEF</u>

11.1    For these reasons, Plaintiffs ask for judgment against Defendants for the following:

      a.      Actual damages;

      b.      Pre- and post-judgment interest;

      c.      Attorney fees;

      d.      Costs of suit; and

      e.      All other relief the Court deems appropriate.

Respectfully submitted,

**CHRISTIAN, SMITH & JEWELL, L.L.P.**

By:   <u>/s/ Gary M. Jewell</u>
GARY M. JEWELL
State Bar No. 10664800
*gjewell@csj-law.com*
2302 Fannin, Suite 500
Houston, Texas  77002
Telephone: (713) 659-7617
Facsimile:  (713) 659-7641

**ATTORNEY FOR PLAINTIFFS**