United States District Court
Southern District of Texas
**ENTERED**

January 21, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AZTEC OIL AND GAS, INC. and | § | |
| AZTEC ENERGY, LLC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | Civ. A. H-15-0866 |
| | § | |
| FRANK FISHER, ROBERT SONFIELD, | § | |
| L. MYCHAL JEFFERSON, II, | § | |
| LIVINGSTON GROWTH FUND TRUST, | § | |
| and INTERNATIONAL FLUID | § | |
| DYNAMICS, LLC, | § | |
| | § | |
| Defendants. | S | |

**OPINION AND ORDER**

In response to the above referenced main case, which alleges "corporate hijacking" and seeks damages and declaratory relief,

Third Party Plaintiffs Frank Fisher,[1] Robert Sonfield,[2] and the

_____

[1] Frank Fisher ("Fisher") served as chief executive officer and chairman of the board of directors of Aztec from approximately June 2007 and January 2010, and currently owns at least 606,465 shares of Aztec common stock and, with his companies, 8,000,000 unexercised warrants for shares of Aztec common stock. First Amended Third Party Complaint, #34 at ¶25. Over time Fisher and his companies, one of which is Defendant International Fluid Dynamics, LLC ("IFD"), have made substantial loans to Aztec and have been the primary source of continued and necessary financial support for Aztec. *Id.* They have provided substantial business and financial services to Aztec, which still owes them payment for these services. ¶28.

*Black's Law Dictionary* (6th ed. 1990), defines "Stock warrants" as follows:

> Certificates entitling the owner to buy a specified amount of stock at a specified time(s) for a specified price. Such differ from stock options only in that options are generally granted to employees and warrants are sold to the public. Warrants are typically long period options, are freely transferable, and if the underlying shares are listed on a securities exchange, are also publicly traded.

[2] The Original Complaint (#1 at ¶ 5.17-22) identifies Robert Sonfield ("Sonfield") as a Houston attorney allegedly specializing in securities and corporate law, who represented Utah corporation Aztec Communications in its purported merger with Aztec Communications Group, Inc., a Nevada corporation. The First Amended Third Party Complaint alleges that Sonfield, pursuant to revocable powers of attorney given to him by certain Aztec directors in 2004, was required but failed "to file certain forms with the SEC in 2004 through 2005," "failed to disclose ownership of Aztec Series A Preferred stock by Livingston Growth Fund Trust," was Aztec's special securities counsel during a time when certain forms "were defectively signed or contained other defects, misrepresentations or omissions," and "violated federal securities laws, breached fiduciary duties, committed fraud, aided and abetted breaches of fiduciary duties, engaged in a conspiracy, committed legal malpractice, and violated the Texas Deceptive Trade Practices--Consumer Protection Act." #34, ¶58.

Livingston Growth Fund Trust ("Livingston")[3] by and through Livingston's sole trustee, Robert L. Sonfield, Jr. ("Sonfield, Jr."),[4] who are Defendants in the main suit, bring a Third Party shareholder derivative and direct action on behalf of themselves and Aztec Oil & Gas, Inc., against allegedly self-dealing, conflicted officers and directors of Aztec Oil and Gas, Inc. ("Aztec Oil"), Third Party Defendants Jeremy Driver ("Driver"),[5]

---

[3] Livingston, a grantor trust established by Fisher and his own attorneys in November 2010 for estate planning purposes, with Fisher's wife the sole beneficiary, currently owns all 100,000 shares of Aztec's outstanding Series A preferred stock and 3,603,857 shares of Aztec common stock. ¶26. Because the Series A preferred stock always controls the number of votes equal to 70% of all outstanding shares of Aztec's capital stock so that the holders of the outstanding shares of the Series A preferred stock always constitute 70% of the voting rights of Aztec, Livingston holds voting power in Aztec in excess of 70% of the voting rights of the company. #34, at ¶25; see also Original Complaint, #1 at ¶¶5,34, 6.9, 6.12, 6.36. Together Fisher and Livingston own more than 80% of the voting power in Aztec. #34 ¶27. In view of their substantial interests in Aztec as well as Fisher's expertise, Mark Vance ("Vance") proposed, and the board of directors approved, a resolution to include Fisher and Livingston's sole trustee, Sonfield, Jr., in all future Aztec director meetings. ¶27.

[4] Sonfield, Jr., as the sole trustee of Livingston, has sole voting power of Livingston's shares. Individually he allegedly has no personal interest in the Livingston shares. #34 ¶26.

[5] Driver became president of Aztec in March 2014 and on or about April 2, 2015 was allegedly elected a director of Aztec. ¶4.

Kenneth E. Lehrer ("Lehrer"),[6] and Mark Vance ("Vance")[7].  Third
Party Plaintiffs assert causes of action against these officers
and directors for breach of fiduciary duty, aiding and abetting
breach of fiduciary duty, fraud, waste of corporate assets,
concerted action and conspiracy.  Third Party Plaintiffs also
claim that Driver, Lehrer, and Vance fraudulently tried to
eliminate Fisher's and Livingston's interests and vote in Aztec
Oil and to dilute Aztec Oil's voting powers, as well as to shield
themselves from liability and replacement.

Pending before the Court in the Third Party action is Third
Party Defendants Driver, Lehrer, Vance, and Nominal Third Party
Defendant Aztec Oil's[8] motion to dismiss the Third-Party Complaint
for failure to state a claim upon which relief can be granted
under Federal Rules of Civil Procedure 12(b)(6) and 23.1
(instrument #29).

### Standard of Review

When a district court reviews a motion to dismiss pursuant to
Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor

---

[6] Lehrer is now, and has been at all times material to this
suit, an officer of Aztec and has served as chief financial
officer and vice president.  #34 at ¶4.  He owns at least 562,587
of Aztec common stock.  ¶21.

[7] Vance is now, and has at all material times been. a
director of Aztec.  ¶6.  He currently owns at least 219,364
shares of Aztec common stock.  ¶22.

[8] Aztec is a corporation organized and existing under the
laws of the state of Nevada with its principal place of business
in Houston, Texas. ¶7.  See factual allegations of the Original
Complaint, pp. 18-21 of this Opinion and Order.

of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action").  "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S.

41 . . . (1957)["a complaint should not be dismissed for failure
to state a claim unless it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim which would
entitle him to relief"], and instead required that a complaint
allege enough facts to state a claim that is plausible on its
face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir.
2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191,
205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss,
the plaintiff must plead 'enough facts to state a claim to relief
that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at
1974).  "'A claim has facial plausibility when the pleaded factual
content allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged.'"  *Montoya v.
FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir.
2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The
plausibility standard is not akin to a "probability requirement,"
but asks for more than a "possibility that a defendant has acted
unlawfully." *Twombly*, 550 U.S. at 556.  Dismissal is appropriate
when the plaintiff fails to allege "'enough facts to state a claim
to relief that is plausible on its face'" and therefore fails to
"'raise a right to relief above the speculative level.'"  *Montoya*,
614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

    In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court
stated that "only a complaint that states a plausible claim for

relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

Federal Rule of Civil Procedure 23.1 states in relevant part,

**(a) Prerequisites.** This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

**(b) Pleading Requirements.** The complaint must be verified and must:

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

-7-

(3) state with particularity:

> (A)  any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

> (B) the reasons for not obtaining the action or not making the effort.

A shareholder derivative action allows individual shareholders of a corporation to file suit on the corporation's behalf as "a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991).  "To discourage abuse of this remedy, courts require that shareholders who wish to initiate a derivative action must first 'demonstrate that the corporation itself has refused to proceed after suitable demand, unless excused by extraordinary conditions.'" *Hanson v. Odyssey Healthcare, Inc.*, No. 04-CV-2751-N, 2007 WL 5186795, at *2 (N.D. Tex. Sept. 21, 2007), *citing Kamen*, 500 U.S. at 95.

To meet the demand requirement of Rule 23.1, a shareholder must allege that he either made a demand on a corporation's board or explain why such a request would have been futile. Because Third Party Plaintiffs here concede that they did not make a pre-suit demand on the Board of Directors of Aztec Oil, they must adequately plead why such a demand would have been futile. *Rules v. Blasband*, 634 A.2d 927, 932 (Del. 1992).  The law of the

nominal defendant's state of incorporation, here Aztec Oil's state of incorporation, Nevada, determines the substantive elements of the demand requirement. *Id.* at 96. Nevada law often draws on Delaware law for corporate issues, including adopting Delaware law regarding demand futility. *Energytec, Inc. v. Proctor,* Civ. A. Nos. 3:06-CV-871-L, et al., 2008 WL 4131257, at *3 & n.3 (N.D. Tex. Aug. 29, 2008), *citing Shoen v. SAC Holding Corp.*, 122 Nev. 621, 137 P.3d 1171, 1179-80 (Nev. 2006); *in accord Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014)("Nevada courts look to Delaware law for guidance on demand futility."). Thus the Court applies the law of Nevada and Delaware.

In *Shoen*, the Nevada Supreme Court set out the law in Nevada for evaluating the pleading of shareholder derivative actions. Generally in Nevada, a corporation's board of directors fully controls the affairs of its corporation. 137 P.3d at 1178. The power to act on the corporation's behalf is governed by the board's fiduciary relationship with the corporation and its shareholders, which imposes on the directors a duty of care, obliging them to act on an informed basis, and a duty of loyalty requiring them to act in good faith in the corporation's and the shareholders' best interests over the interests of anyone else, including their own. *Id.*

As a balance, to protect the board of directors in the performance of their tasks, the business judgment rule establishes

a "presumption that in making a business decision the directors of a corporation acted in an informed basis in good faith and in the honest belief that the action was taken in the best interests of the company." *Id.* at 1178-79, *citing* NRS 78.138.

While the board of directors generally makes the decisions whether to take legal action for the corporation, if the board fails to act appropriately, the shareholder may filed a derivative action in equity to enforce the corporation's rights against the board of directors and the corporation's officers as well as against third parties. *Id.* at 1179. Nevertheless because the board of directors usually controls the corporation's affairs, "a shareholder, before filing suit, must make a demand on the board, or if necessary, on the other shareholders, to obtain the action that the shareholder desires" for two reasons:

> First, a demand informs the directors of the complaining shareholder concerns and gives them an opportunity to control any acts needed to correct improper conduct or actions, including any necessary litigation. The demand requirement also acknowledges that "the acts in question may be subject to ratification by a majority of the shareholders, thus precluding the necessity of suit." Second, the demand requirement protects clearly discretionary directorial conduct and corporate assets by discouraging unnecessary, unfounded, or improper actions. Thus in "promoting . . . alternative dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."

*Id.* (citations omitted).

Nevada Rule of Civil Procedure ("NRCP") 23 imposes heightened

-10-

pleading requirements on shareholder derivative suits. "The shareholder must state with particularity the demand for corrective action that the shareholder made on the board of directors (and, possibly, on other shareholders), and why he failed to obtain such action, or his reasons for not making a demand)," providing particularized factual statements showing "a demand has been made and refused, or that making a demand would be futile or otherwise inappropriate." *Shoen*, 137 P.3d at 1179-80 (clarifying the pleading requirements for shareholder derivative suits). "The relevant facts 'must be put forth in the complaint and not merely in subsequent briefs.'" *Jacobi v. Ergen*, No. 2:12-cv-2075-JAD-GWF, 2015 WL 1442223, at *2 (D. Nev. Mar. 30, 2015), *citing Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007). This heightened pleading standard of particularized facts "is . . . more onerous than that required to withstand a Rule 12(b)(6) motion." *Id., citing Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008). The shareholder does not have to plead evidence, but "mere conclusory assertions will not suffice under NRCP 23.2's 'with particularity' standard." *Shoen*, 137 P.3d at 1180. The district court "must accept as true each of the complainant's particularized factual allegations and draw every fair factual inference flowing from those particularly alleged facts in favor of the nonmoving party." *Id.* If the shareholder fails to satisfy the pleading standard, then the shareholder lacks standing and dismissal of the complaint is warranted for failure to state a claim upon which relief may be granted. *Id.*

At one time under Nevada law, "where the board participated in the wrongful act or is controlled by the principal wrongdoer, it [was] generally held that no demand [was] needed." *Shoen*, 137 P.3d at 1180*, citing Udevco, Inc. v. Wagner*, 100 Nevada 185, 678 P.2d 676, 679 (1984). Nevertheless a complaint that merely alleges that a majority of the directors participated in wrongful acts is no longer sufficient to excuse a failure to make a demand under Nevada law because generally even a bad decision is protected by the business judgment rule. *Id.* at 1181. The business judgment rule, however, "pertains only to directors whose conduct falls within its protections, and thus "applies only in the context of a valid interested director action or the valid exercise of business judgment by disinterested directors in light of their fiduciary duties." *Id.*

The Nevada Supreme Court has elected to follow the Delaware Supreme Court in requiring two analyses to be conducted, "depending on whether the board that would consider a demand is (1) potentially protected by the business judgment rule when its direct action is in question, or (2) can be disinterested and independent in its evaluation of the demand for corrective action." *Id*. at 1181-82. In *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), *and modified by Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993), the Delaware test for demand futility was created, based on allegations of particularized facts:  whether a reasonable doubt "is created that:  (1) the directors are

disinterested and independent and  (2) the challenged transaction was  otherwise  the  product  of  a  valid  exercise  of  business judgment," i.e, an inquiry "into the substantive nature of the challenged transaction and the board's approval thereof."  The Delaware Supreme Court explained,

> As to the latter inquiry, the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board.  Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint.  As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board.  Certainly, if this is an "interested" director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases.  In that event futility of demand has been established by any objective or subjective standard.

*Aronson*, 473 A.2d at 814-15.  To be disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.  Thus, if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever in determining demand futility."  *Id.* at 812.  "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  *Id.* at 816.

In *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993), the

-13-

Delaware Supreme Court further developed and modified the *Aronson* test.  In *Rales*, the Delaware Supreme Court considered the application of the *Aronson* test in situations when the board is considering a demand not implicated in a challenged business transaction (i.e., where the business judgment rule technically would not apply) and concluded that in such circumstances, "'the demand futility analysis considers only whether a majority of the directors had a disqualifying interest in the [demand] matter or were otherwise unable to act independently'" when the complaint was filed, or "'whether the board that would be addressing the demand  can impartially consider its merits without being influenced by improper considerations,' such that it could 'properly exercise[] its independent and disinterested business judgment in responding to a demand.'"  *Shoen*, 137 P.3d at 1183.  To demonstrate interestedness, the shareholder must assert that "a majority of the board members would be 'materially affected' either to [their] benefit or detriment, by a decision of the board,  in a manner not shared by the corporation and the stockholders."  *Id.* at 1183.  "Allegations of mere threats of liability  through  approval  of  the  wrongdoing  or  other participation, however, do not show sufficient interestedness to excuse the demand requirement.  Instead, as the Delaware courts have indicated, interestedness because of potential liability can be shown only in those 'rare case[s] . . . where defendants' actions  were  so  egregious  that  a  substantial  likelihood  of director liability exists."  *Shoen*, 137 P.3d at 1183-84.

In *Shoen* the Nevada Supreme Court adopted Delaware's *Aronson* test as modified by *Rales*:

> When evaluating demand futility, Nevada courts must examine whether particularized facts demonstrate: (1) in those cases in which the directors approved the challenged transactions, a reasonable doubt that the directors were disinterested or that the business judgment rule otherwise protects the challenged decisions; or (2) in those cases in which the challenged transactions did not involve board action or the board of directors has changed since the transactions, a reasonable doubt that the board can impartially consider a demand.

*Id.* at 1184. The first prong followed *Rales'* replacement of the conjunctive, "and," with the disjunctive, "or," in the *Aronson* test. 634 A.2d at 933.

Alternatively, demand may also be excused when a shareholder genuinely challenges the board of directors' transactions as ultra vires acts, because if the allegations are taken as true, the act is void and not subject to shareholder ratification. *Shoen*, 137 P.3d at 1186. "[A] corporate act is said to be ultra vires when it goes beyond the powers allowed by state law or the articles of incorporation." *Shoen*, 137 P.3d at 1185. "If the corporation acts within its corporate powers, but the action was done without authorization, it is not ultra vires. *Id.* at 1186.

With regard to Rule 23.1(a)'s requirement that a derivative action's plaintiff "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation," in *Youngman v. Tahmoush*, 457 A.2d

376, 379 (Del. Ch. 1983),[9] the court opined that while the only explicit standing requirement for maintaining a derivative suit is that the plaintiff be a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolves upon him by operation of law," a court "can and should examine any extrinsic factors which make it likely that the interests of other stockholders will be disregarded in the prosecution of the suit"; the *Youngman* court set out implicit "intertwined or interrelated factors" for determining whether the plaintiff satisfies the adequacy and fairness requirement in a derivative action.    *Id.* at 379.  These include "economic antagonisms between representative and class; the remedy sought by the plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiffs and the defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants and, finally the degree of support the plaintiff is receiving from the shareholders he purported to represent."   *Id.* at 379-80.  "'A major 'type of antagonism . . . is clear economic antagonism between representative and class.'"   *Id.* at 380, *quoting Schnorback v.*

_____

[9] *Youngman* has been described as "[t]he seminal Delaware case" that "sets forth the standard on standing for a derivative action under Delaware law." *Delta Financial Corp. v. Morrison*, 13 Misc. 3d 1232  at *5 (N.Y. Sup. Nov. 2, 2006).

*Fuqua*, 70 F.R.D. 424, 433 (S.D. Ga. 1975). The court emphasized that "before a plaintiff can be found to be disqualified to maintain an action under . . . Rule 23.1, a defendant must show that a serious conflict of interests exists, by virtue of one factor or a combination of factors, and that the plaintiff cannot be expected to act in the interests of others because doing so would harm his other interests." *Id.* at 381. "The fact that a plaintiff may have interests which go beyond the interests of the class, but are at least co-extensive with the class interest, will not defeat his serving as a representative of the class." *Id.* at 380.

The Ninth Circuit, in which Nevada is located, has held that among factors that should be considered in determining the adequacy of the representative is that he should "be free from economic interests that are antagonistic to the interests of the class," "the degree of support received by the plaintiff from other shareholders," "the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself," and "plaintiff's vindictiveness toward the defendants." *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990).

The Ninth Circuit has also affirmed dismissal of a derivative action where the plaintiff attempted to use the derivative suit as leverage in his individual suit against the same defendants. *Id.* at 1367, *citing Hornreich v. Plant Industries, Inc..* 535 F.2d 550 (9th Cir. 1976). *See also Rothenberg v. Security Management Co.*, 667 F.2d 958, 960-61 (11th Cir. 1982)("The district court's

-17-

determination that Mrs. Rothenberg would not 'fairly and adequately' represent Security's other shareholders derived in part from the possibility that she might use the derivative action as leverage to obtain a favorable settlement in other actions brought against the corporation."); *Blum v. Morgan Guaranty Trust Co. of New York*, 539 F.2d 1388, 1390 (5th Cir. 1976)(trial court should be wary of allowing a derivative action to go forward where the "representative could conceivably use the derivative action as 'leverage' in other litigation"); *G.A. Enterprises, Inc. v. Leisure Living Commun., Inc.*, 517 F.2d 24, 26-27 (1st Cir. 1975); *Zarowitz v. BankAmerica Corp.*, 866 F.2d 1164 (9th Cir. 1989)(derivative action plaintiff Zarowitz, a nonsettling defendant in individual litigation against the corporation, lacks standing to sue as a representative plaintiff in a separate derivative action where his interest in increasing the value of his corporation stock through larger derivative suit recovery was dwarfed by his interest in pursuing wrongful termination and defamation actions against the corporation bank); *Owen v. Modern Diversified Ind., Inc.*, 643 F.2d 441, 443 (6th Cir. 1981)(Owen could not serve as representative derivative plaintiff where there was "a strong possibility that [the] derivative action would be used merely as a device to obtain leverage" in the plaintiff's individual suit"); *Banks v. Whyte*, No. CIV. A. 94-CV-0711, 1994 WL 418997, at *5 (E.D. Pa. Aug. 9, 1994)("[T]he relative magnitude of the [plaintiff's] personal interest as compared to his interest in

the derivative action . . . is an important consideration in evaluating a derivative suit instituted by a representative entangled in other litigation with the defendant.").

**Factual Allegations of the Original Complaint (#1; Main Action)**

Because to evaluate the motion to dismiss the derivative action one must consider it in the context of the main action, the Court summarizes the complaints of both.

On January 26, 1986 Aztec Communications Group, Inc.,[10] a Utah corporation, was incorporated in and organized under Utah law. After suffering adverse business events, it sold all of its operations in 1990, and in 1994 its corporate charter in Utah was forfeited after it failed to file required annual reports with the State. Under Utah law, if a corporation fails to file for reinstatement within two years of the forfeiture of its charter, it is considered dissolved and cannot be reinstated. Aztec Communications failed to reinstate its charter and was thus deemed administratively dissolved by the State of Utah.

On March 16, 2000, a director of Aztec Communications before its dissolution, Andrew Palmquist, attempted to hold a special meeting of its Board of Directors to appoint L. Mychal Jefferson II ("Jefferson") as Chairman, Chief Executive Officer, and President of Aztec Communications, and John Schwarz and Monica

---

[10] At the time it was known as Asterisk, Inc., but its name was changed to Aztec Communications Group Inc. on August 31, 1987. The Complaint asserts that it was formed "to serve as a 'blind pool,' a company which has no disclosed business purpose, but has the goal to become publicly traded and then find a merger partner at some point in the future." #1 at ¶ 5.1.

Jefferson, as Directors.  On April 21, 2000 Jefferson called a special shareholders meeting to address the reorganization and recapitalization of Aztec Communications and to affirm the new appointments.  In October of that year, Aztec Communications began filing periodic reports, specifically an Annual Report on Form 10-KSB for the year that ended on August 31, 2000 with the SEC, and Jefferson, as purported president, sought to reinstate the corporate charter.  The [Utah] State's Division of Corporations and Commercial Code ("Division") denied his application for reinstatement as untimely.  Jefferson appealed, but the denial was affirmed by the Divisions's Executive Director on January 23, 2001.  Jefferson filed a lawsuit in the Third Judicial District Court, Salt Lake County, requesting the court to set aside the dissolution, but the court refused and dismissed the suit, finding that Aztec Communications ceased to exist when it was dissolved as of 1994 and therefore Jefferson had no authority to act as president, to appoint other officers, or to grant new stock options.  According to the Complaint, the Division demonstrated that Jefferson sought the reinstatement "in order to merge Aztec Communications with another entity so that the resulting company could be publicly traded while avoiding 'going through the process of registering its securities and disclosing information about the company and its officers.'"  #1 at ¶5.11. [11]  Jefferson appealed

_____

[11] In its argument before the Utah state court, the State of Utah argued (1) that the only value in Aztec Communications was the stock that was previously publicly traded and (2) that reinstatement was "'contrary to the purposes of the state and

that decision to the Utah Department of Commerce, which determined that the decision was final, that Aztec's corporate status could not be reinstated, and that the corporation was not allowed to carry on any business other than winding up and liquidating itself.

During this period of efforts to reinstate the dissolved corporation, Houston attorney Sonfield, purportedly a specialist in securities and corporate law, as of August 22, 2003 began representing Jefferson and Aztec Communications.  Fisher, a close friend of Sonfield, lent money to Aztec Communications through his company, International Fluid Dynamics, L.L.C. ("IFD").

On January 20, 2004, Jefferson, Sonfield, and Fisher tried to merge the dissolved Utah corporation Aztec Communications into a Nevada corporation called Aztec Communications Group, Inc., which Sonfield had formed and then incorporated on November 24, 2003, with the latter to be the surviving company.  Sonfield filed the articles of incorporation with Nevada, and Jefferson, Terry Roberts, and Monica Jefferson were named as directors of the new entity.  Jefferson signed the Articles of Merger, which were filed with Nevada on April 20, 2004.  Utah rejected Jefferson's efforts to file the Articles of Merger with its Secretary on the grounds that a dissolved corporation cannot merge with another company and thus the merger was not valid, but Jefferson, Sonfield, and Fisher began doing business as if it were effective.  On July 15, 2004,

_____

federal laws requiring registration of securities and public disclosures'" and would "'facilitate fraud.'"  #1 at ¶ 5.12.

at a shareholders meeting, the name of Aztec Communications was officially changed to Aztec Oil and Gas, Inc. and is henceforth referred to as "Aztec Oil."

Jefferson, Sonfield, and Fisher then began to take steps to gain complete control of Aztec Oil and to enrich themselves. On June 11, 2004, the Board of Directors passed a resolution to designate "Series A Preferred Stock" consisting of 100,000 shares. Series A Preferred Stock was supposedly allocated a non-dilutable 70% voting right: whoever owned the 100,000 shares controlled 70% of Aztec Oil's shareholder vote on any shareholder matters, effectively leaving common stock shareholders in a significant minority position, in essence with no voting rights. Through a series of fraudulent and concealed transfers, ownership of the Series A Stock ended up with Fisher and his trust, Livingston.[12]

Meanwhile on August 6, 2004 the Board of Directors executed what the Original Complaint terms an "ineffective" power of attorney granting Sonfield unrestricted power of attorney to act on behalf of the board in his "sole discretion," and the entire board then resigned. Embracing his new role, in August 2004 Sonfield signed a resolution amending the stock warrant and award plan and a consulting agreement between Aztec Oil and IFD, increasing IFD's, and thus Fisher's, control of the company. Subsequent actions by Sonfield attracted criminal investigations

---

[12] The Court does not go into the detail in the Original Complaint in the main case about the alleged fraud as the focus of this Opinion and Order is on the pending motion to dismiss the Third Party action.

and subpoenas from the Department of Justice. They involved manipulation of Aztec Oil's stock and self-dealing to enrich himself.

On August 14, 2006 Aztec Energy, L.L.C. was formed in Nevada, with its manager identified in documents as Aztec Oil, which is currently a 99% member of Aztec Energy. On April 2, 2009 a resolution was passed terminating Aztec Oil's filing obligation with the SEC, and six days later it filed a Form 15 with the SEC that ended its obligation to file reports with the SEC under Section 12(g) of the Securities Exchange Act of 1934, as amended. Since the deregistration, Aztec Oil's common stock has traded on OTC markets or pink sheets.

Meanwhile on July 22, 2004, IFD entered into a consulting agreement with Aztec Oil for payments of between $10,000 and $15,000 a month until December 2014. Fisher was also given 6 million warrants to purchase restricted common stock of Aztec Oil. The agreement was later extended and the warrants were repriced at substantial financial benefit to IFD.

On June 15, 2007, a resolution was signed naming Fisher CEO and Chairman of Aztec Oil. Aztec Oil then entered into an employment agreement with Fisher for a base salary of $24,000, bonus opportunities, stock, and stock options, in addition to the monies he was receiving through the consulting agreement. On July 21, 2008 the new agreement was modified to increase Fisher's base salary to $144,000 per year. Four months later it was increased to $250,000 per year, thus giving Fisher a double salary for

-23-

performing the same job.  During this period, Lehrer and Vance
constituted a two-thirds majority of the board of directors.  On
January 28, 2010, Fisher resigned as CEO and Chairman, and Aztec
Oil entered into a consulting agreement with Fisher, individually,
also in addition to the consulting agreement with IFD, providing
$15,000 a month either in cash or, at Fisher's election, in stock
valued at 75% of the trading price of the company's common stock,
in return for Fisher's providing expertise and experience in
business and financial matters.  Moreover, on November 29, 2010,
the board extended IFD's consulting agreement to 2017.  At that
time, Lehrer and Vance still constituted a two-thirds majority of
the board of directors.  The resolution acknowledged that Fisher
was performing the same services under two separate agreements
providing him double compensation.  These two duplicative
agreements were extended and amended for the benefit of IFD and
Fisher a number of times.  Fisher claims that pursuant to these
agreements, Aztec Oil owes him approximately $2.6 million and that
he holds rightful title to 8 million warrants/options to purchase
shares of Aztec Oil's restricted common stock, representing
approximately 75% of the current outstanding shares of stock for
Aztec Oil.  Throughout the period Fisher purchased Aztec Oil
common stock for almost no consideration, was granted stock
options and stock in repayment for loans or other services or
received stock through transfers, and then sold the stock at an
enormous personal profit.  The Complaint asserts, "The benefits
Fisher received as both CEO and as President of IFD were egregious

in light of the financial condition of Aztec Oil." #1 at p. 16, ¶ 5.68.

In February 2011 after giving false testimony, Fisher pled guilty to an FBI obstruction of justice charge involving securities fraud with Shelly S. Singhal, a securities broker from Newport Beach, California and an investment advisor to Aztec Oil, for helping to pay for newsletters recommending the purchase of Aztec Oil stock and containing false and misleading statements.[13] As a result Fisher incurred substantial legal fees for which he futilely sought reimbursement from Aztec Oil, but the indemnification provision in his consulting agreement was not valid for criminal acts. Fisher also voluntarily forfeited his Texas law license. Nevertheless in May 2013 it was discovered that Fisher unilaterally authorized the use of Aztec Oil's funds to pay for his defense and reimbursement of prior expenses without the Board of Directors' approval and without informing anyone at Aztec Oil. Aztec Oil was never reimbursed for the nearly $1,000,000 it paid for Fisher's legal fees.

When Driver became President of Aztec Oil by a Board resolution on March 13, 2014, he began to prepare for filing a new registration statement with the SEC that would allow Aztec Oil to be a reporting company again. In the process he realized that

---

[13] Singhal was indicted in April 2010 on three counts for involvement in a conspiracy and scheme to defraud the investing public through stock manipulation schemes resulting in his obtaining at least $10 million through the scheme to defraud by artificially increasing the demand for shares of three companies, including Aztec Oil, through these newsletters.

Aztec Oil's formation and its prior disclosures to the SEC were suspect.  Driver then took action to remove the fraudulent actors from all company dealings.

Plaintiffs Aztec Oil and Aztec Energy, L.L.C. then brought this main suit against Fisher, Sonfield, Jefferson, Livingston and IFD for violation of the federal securities laws, breach of fiduciary duty, fraud, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conspiracy, legal malpractice, and violations of the DTPA.

**Factual Allegations of the First Amended Third Party Complaint (#34)**

The amended Third Party Complaint, brought by some Defendants in the main action, i.e., Fisher, Sonfield, and Livingston Growth Fund Trust, by and through its sole Trustee, Sonfield, Jr., presents, as expected, a starkly different picture of the various parties and events.  The First Amended Third Party Complaint emphasizes that Third Party Defendants, Driver, Lehrer, and Vance by reason of their positions as officers and directors Of nominal Third Party Defendant Aztec Oil and their ability to control its business and corporate affairs, owed its shareholders the fiduciary obligations of good faith, loyalty, and due care. They were thus required to use their utmost ability to control and manage Aztec Oil in a fair, just, and equitable manner, to act in furtherance of the best interests of Aztec Oil and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.  Because of

-26-

their positions of control and authority, Third Party Defendants were allegedly able to and did, directly or indirectly, initiate and exercise control over the wrongful acts of which the Third Party Complaint alleges.

Third Party Plaintiffs assert that Third Party Defendants violated the trust of Aztec Oil's stockholders by participating in self-dealing schemes, conflicts of interest, gross waste of corporate assets, breaches of their fiduciary duties, and failure to use funds in a manner to safeguard the corporation's future. They also purportedly targeted and sought to eliminate Fisher's and Livingston's interests and voting power in Aztec Oil through a number of fraudulent schemes, including those involving dilution of Aztec's stock voting powers, and to insulate themselves from liability and orderly replacement. *See* Nevada Revised Statute ("NRS") 78.120(1) (vesting full control of the affairs of the corporation in the directors); NRS 78.138(1)(requiring directors to "exercise their powers in good faith and with a view to the interests of the corporation").

According to the First Amended Third Party Complaint, Aztec Oil has failed to pay Fisher and his companies the full amount it owes for Fisher's significant business and consulting services. Fisher's IFD entered a consulting agreement with Aztec as of July 22, 2004 for a period from January 1, 2005 through December 14, 2014, subsequently extended to 2017 by the board of directors, with Lehrer and Vance comprising two thirds of the board and with Aztec Oil agreeing to pay IFD a monthly retainer beginning January

2004, plus warrants for common shares of Aztec's stock and certain fees.  Although IFD performed all its obligations, Aztec Oil has refused to pay IFS's $1,575,000 monthly consulting fees through April 2, 2015 plus expenses.  Aztec Oil also remains liable for future fees of $15,000 per month through the agreement's extended term.  Aztec Oil, under Driver's instruction, recently tried to terminate the agreement retroactively to June 15, 2007.  IFD has filed a counterclaim (#13) in the main action to collect what is due and owing to it under the consulting agreement.

Fisher entered into an Executive Employment Agreement with Aztec, effective as of June 15, 2007, when Aztec had little funding and no one was willing to lead the corporation.  Under the agreement, approved by the board of directors, two thirds of which were Lehrer and Vance, Fisher was to perform the functions of chairman of the board of directors and chief executive officer, with the understanding that only a small amount of Fisher's time and effort would be required.  In return Aztec Oil was to pay Fisher a base salary of $24,000 per year, annual incentive compensation, long-term incentive compensation, and stock and options.  The agreement was amended on July 21, 2008 to reflect the increase in assets and values resulting from Fisher's work, increasing his base salary to $144,000, and again on November 10, 2008, to $250,000, all with the approval of the board.  Fisher performed his obligations until January 2010, when he retired, but Aztec Oil has not paid Fisher the compensation owed under the Executive Employment Agreement, specifically at least $410,255.67

-28-

in salary, plus annual and long-term incentive compensation, stock and options.  Fisher has filed a counterclaim (#14) in the main suit to collect these amounts.

After Fisher retired from his positions at Aztec Oil, Aztec Oil allegedly wanted to continue to benefit from his expertise and as of February 2, 2010, the two entered into another Consulting Agreement for Fisher to continue providing consulting and advisory services for five years for base payments to Fisher of $15,000 per month, plus annual and long-term incentive compensation, certain expenses, an office, and limited clerical support.  This agreement, too, was approved by the board of directors, including Lehrer and Vance, who still made up two-thirds of the board. Fisher claims he has met his contractual obligations since February 2, 2010, while Aztec has paid only part of his compensation, approximately $130,000, but not the rest or expenses.  He maintains that Aztec remains liable for this compensation through the extended term of the agreement into 2017. Again, Aztec Oil tried to terminate the Consulting Agreement, retroactive to February 2, 2017.  Third Party Plaintiffs contend that the purported termination is ineffective because no "cause" as defined in the agreement has occurred to allow such termination, no opportunity or notice for cure has been given as required by the contract, the agreement or the applicable law do not permit retroactive termination after the services have been provided, and Aztec's officers and directors have not properly authorized it.  Fisher has included this claim also in a

-29-

counterclaim (#14) in the main action.  On or about March 2, 2015, Fisher purportedly made a written request that Aztec begin nominal payments to repay cash loans and deferred fees that Aztec Oil also owed to him.

The Third Party Plaintiffs also charge Driver, Lehrer and Vance with attempting to acquire a controlling or substantial interest in Aztec Oil.  In 2013 or 2014 Driver unsuccessfully tried to buy 100,000 shares of Aztec Series A preferred stock owned by Livingston and to purchase a large block of common stock from Aztec's terminated former president, Waylan Johnson, at a favorable price in exchange for Driver's causing Aztec to drop its malfeasance claims against Johnson.  After Fisher, in his role as Consultant to Aztec, discovered Driver's scheme to usurp this corporate opportunity, in conflict with and breach of his duties to Aztec and its board of directors, over Fisher's and Sonfield's objections the majority of the board of directors restructured the settlement they had made with Johnson and had Aztec acquire Johnson's shares of common stock and place them in the treasury so Driver could not get to them. A misleading Aztec press release falsely reporting the settlement was prepared wholly or in part at Johnson's direction and released.

Having failed to acquire a controlling or substantial interest in Aztec Oil from Livingston or Johnson, Driver, supposedly in conspiracy with Lehrer and Vance, embarked on a plot for personal gain by reducing the interests of others in Aztec Oil and by causing harm to Fisher, Livingston, and Sonfield at the

expense of Aztec Oil and its shareholders. After secret
discussions between Driver and Vance and between Driver and
Lehrer, from which director Dayton Wheeler ("Wheeler")      [14]  was
deliberately excluded, on April 2, 2015 they called a meeting of
Aztec Oil's directors, of which Livingston Trustee Sonfield, Jr.
was given no notice and which he did not attend.  At the meeting
Driver and Lehrer denied Wheeler the right to vote on the grounds
that he had a conflict of interest because he was Fisher's
stepson.  Furthermore several items presented for vote were
mischaracterized to Wheeler via telephone, and possibly also to
Vance.  The meeting was too short for the directors to examine or
investigate the volume of documents, issues, and other items
presented by Driver and/or Lehrer for consideration.  One such
item was Driver and Lehrer's proposal, despite the lack of any
legitimate reason and no existing directorship vacancy, to expand
the board of directors from three to four members, with Driver to
become the fourth, even though Aztec Oil had never had more than
three directors and despite Driver's unsuitability.[15]

---

[14] Wheeler became a director of Aztec on or around February
1, 2010 and has remained as such ever since.  #34, ¶23.

[15] The First Amended Third Party Complaint represents that
Driver is currently under investigation by the United States
Department of Justice for possible violations by Hyperdynamics
Corporation (an entity affiliated with Driver and members of his
family) of the Foreign Corrupt Practices Act or federal anti-
money-laundering statutes.  The complaint states that Driver had
little or no previous oil and gas experience when he was hired by
his father-in-law to work at Hyperdynamics, which similarly had
no such background.  The government was investigating the active
involvement of Driver in obtaining, retaining and/or renewing oil

The directors at the meeting also considered a resolution to amend Aztec's bylaws, misrepresented by Driver, which was also approved.  The amendment eliminated the right of those Aztec Oil shareholders who together own of record at least 25% of all outstanding stock of all classes to vote to call a special meeting of shareholders; as a result only a majority of the board of directors, the chairman of the board, or the chief executive officer or president of Aztec could call a shareholders' meeting. Thus the power of the shareholders was diminished and their interests were subordinated to those of the directors, while perpetuating the control of Driver and Lehrer as directors.

As a third matter, the directors' meeting considered Driver and Lehrer's proposals that Aztec terminate the Consulting Agreement with IFD retroactively to June 15, 2007 and the Consulting Agreement with Fisher retroactively to February 2, 2010, and that Aztec Oil engage the law firm of Christian Smith &

---

and gas concession rights in the Republic of Guinea and the parties' relationship with some charitable organizations involving Guinea.  Driver was also purportedly chairman and chief executive officer of Duma Energy Corporation ("Duma"), which was awarded a large oil concession in Namibia and given a major stock promotion.  Driver's father-in-law then allegedly merged his Hydrocarb Corporation with Duma and took a substantial amount of stock in the surviving company, thereby diluting the stock held by other shareholders.  Driver then quickly left Duma and joined Aztec Oil within 90 days.

In the reply (#38 at p. 11 n.1, Third Party Defendants Driver, Lehrer, Vance, and Aztec Oil contend, "Contrary to the pleadings filed by Third Party Plaintiffs, Driver is not now, nor has he been, the subject of an investigation by the U.S. Department of Justice.  Instead, Driver has served as a witness in the investigation of his former employer."

Jewell, L.L.P. by Aztec to file suit against Fisher, IFD, Livingston, and Sonfield.  Though not yet hired, the firm allegedly had already prepared a forty-two page complaint.  The proposal also provided that Aztec would grant the lawyers a second lien security interest in Aztec's assets to secure payment of the attorney fees to be incurred.  The resolutions were allegedly approved, and the complaint was filed that same day as the directors' meeting, April 2, 2015.

Also considered at the meeting was a proposal from Driver and Lehrer for a renegotiated employment contract between Aztec and Driver, providing far better benefits and compensation to Driver than his current contract.  Because he could not vote on this matter of self interest, Driver abstained, so only Lehrer and Vance remained and they did not constitute a majority of the board at the time.  Although section 2.5 of Aztec's bylaws required a resolution to be passed by a majority of the directors present at a meeting, Driver and Lehrer continued to act as if the renegotiated contract had been approved and was valid and effective.

On April 7, 2015, after discovering the fraud perpetrated on him as a director, Wheeler purportedly rescinded all of his actions at the April 2, 2015 meeting because it became clear from written material distributed by Driver after the meeting that Driver had misrepresented to telephonic participants the content of the matters on which the directors were voting, the resulting loss of power by shareholders against the directors, and the

-33-

effort to perpetuate Driver and Lehrer as directors, and that he had concealed what now appeared to be a conspiracy between Driver and Lehrer to take over Aztec Oil for personal gain and benefit.

In furtherance of the Third Party Defendants' scheme, Driver, in correspondence also dated April 2, 2015, informed IFD that Aztec had terminated its Consulting Agreement with IFD retroactively to June 15, 2007.  The Third Party Complaint asserts that this purported termination had no effect because the Consulting Agreement required mutual consent, because retroactive termination after services had been performed was not allowed by the Agreement or the applicable law, and because it was not properly authorized by Aztec's directors and officers.  Driver also informed Fisher that Aztec had terminated its Consulting Agreement with him retroactive to February 2, 2010.  That termination was also allegedly ineffective because there was no cause, as defined in the Contract, no notice or opportunity to cure as required by the contract, and the agreement or the applicable law did not permit terminations after services were provided, nor was it properly authorized by Aztec's directors and officers.  These ineffective terminations purported to expose Aztec to liabilities in excess of $2,813,646.62.

Also on April 2, 2015, Driver informed Fisher that Aztec had filed suit against him to obtain a settlement with him.

Although financing in the amount of $600,000 was obtained in the first half of 2015, with Fisher's help, to pay for Aztec's share of drilling program costs to Texas Secondary Oil

Corporation, Aztec has not paid most of it and may therefore lose some or all of its related mineral interests.  During the same period Aztec sold for approximately $450,000 its interest in a Blue Ridge Oil and Gas Exp., Inc. oil and gas drilling project, which Fisher had procured for Aztec, and it also sold its interest in the Sydri Operating, LLC oil and gas drilling project for approximately $550,000.  Driver has refused to give Aztec's directors ongoing, detailed cash reports or detailed cash accountings for these loan proceeds and sale funds, nor has he prepared financial statements accounting for such funds in the approximate amount of $1,605,735.63.  The First Amended Third Party Complaint suggests "[o]n information and belief, these funds have been misapplied and used for improper purposes by Driver, Lehrer and Vance."  #34, ¶54.

Under NRS 78.330 and Section 1.1 of Aztec's bylaws, Aztec must hold a shareholders' meeting annually to elect directors and transact other business.  Nevertheless no meeting has been held in over three years.  On April 2, 2015, Fisher requested in writing (copy of email attached to #34 as Exhibit A) that Aztec's directors schedule a shareholders meeting to elect directors and to review, approve, or disavow the actions taken at the April 2, 2015 directors' meeting.  Fisher again recently alerted the directors to his demand for a shareholders meeting.  Despite Fisher's requests and Wheeler's objections, Driver, Lehrer and Vance, in furtherance of their conspiracy to take over Aztec for personal gain, have refused to schedule one, in violation of

-35-

Nevada law and Aztec's bylaws.

### Third Party Defendants' Motion to Dismiss (#29)

Third Party Defendants Driver, Lehrer, Vance and Aztec Oil contend that (1) this Third-Party derivative shareholder action is a frivolous attempt to obfuscate the issues before the Court in the main action in order to hide Third Party Plaintiffs/Defendants' own wrongdoing, and that Third Party Plaintiffs lack standing to bring this action on behalf of Aztec; and (2) Third Party Plaintiffs have failed to satisfy the prerequisites and procedural steps for a derivative action under Fed. R. Civ. P. 23.1.  Specifically, regarding the second ground for dismissal, Third Party Defendants challenge the following as deficiencies of the Third Party Complaint[16] under Rule 23.1:  (a) Third Party Plaintiffs do not fairly and adequately represent the interests of the shareholders; (b) they have failed to file a "verified complaint" that alleges efforts made by Third Party Plaintiffs to obtain the action they desire from the directors or comparable authority, including making a pre-suit demand upon the board, and the reasons for their failure; or (c) they have failed to show that their failure to make a demand was excused for futility.

The Court notes that Third Party Plaintiffs have since filed their verified First Amended Third Party Complaint (#34) in an

---

[16] The Third Party Complaint (#16) has been superseded by the First Amended Third Party Complaint (#34).  In this Opinion and Order the Court addresses only those challenges which are still viable after the amendment.

effort to cure the problems pointed out in the motion to dismiss. The Court finds that the allegation that their complaint is not verified is now mooted by the amended pleading. Nevertheless Third Party Defendants continue to assert that the requirements of Rule 23.1 have not been satisfied in that Third Party Plaintiffs still do not fairly and adequately represent the interests of the shareholders,[17] and, since they failed to make a pre-suit demand, why they did not and that it would have been futile to make such a demand.

Third Party Defendants analogize the position of Third party Plaintiffs here to that of the shareholders in *Darrow v. Sundown, Inc.*, 574 F.2d 1333 (5th Cir.), *cert. denied*, 439 U.S. 984 (1978), in which the shareholder plaintiff who brought the derivative action was simultaneously involved in a lawsuit where he was the defendant and the corporation was the plaintiff. The Fifth

---

[17] Third Party Defendants cite *Blum v. Morgan Guaranty Trust Co. of New York*, 539 F.2d 1388, 1390 (5th Cir. 1976)("While a plaintiff is not necessarily disabled to bring [a shareholders' derivative] suit simply because some of his interests extend beyond that of the class, the court may take into account outside entanglements that render it likely that the representative may disregard the interests of the other class members."); and *Smith v. Ayers*, 977 F.2d 946, 949 (5th Cir. 1992)("A plaintiff in a shareholder derivative action owes the corporation his undivided loyalty. The plaintiff must not have ulterior motives and must not be pursing an external personal agenda."). They also cite *Sunset Management, LLC ex rel. Transcontinental Realty Investors, Inc. v. American Realty Investors, Inc.*, No. Civ. A. 3:04-CV-2162-K, 2005 WL 1164181, at *2 (N.D. Tex. May 16, 2005)("[T]he trial court should beware allowing a derivative suit to proceed where 'the representative could conceivably use the derivative as 'leverage' in other litigation . . . .'"), *citing Blum*, 539 F.2d at 1390.

Circuit found there was an apparent conflict of interest in the shareholder plaintiff's claim to fairly and adequately represent the other shareholders while he sought to "occupy simultaneously the position of a defendant sued by the corporation and that of a shareholder seeking to advance the interest of the corporation." *Id.* at 1336-37 ("on principles akin to standing," "[t]he equitable principles that form the basis for all stockholders' derivative suits preclude" a plaintiff from "occupy[ing] simultaneously the position of a defendant sued by the corporation and that of a shareholder seeking to advance the interest of this corporation" because he could not represent the other shareholders fairly and adequately as required by Rule 23.1.). The same is true here, argue Third Party Defendants, that Third Party Plaintiffs, who have been sued by Aztec Oil in the main action, therefore lack standing to sue its directors and officers in a derivative action.

Moreover courts have recognized that shareholder derivative actions can serve as a "particularly effective weapon for purposes of obtaining a favorable settlement in other actions." *Rothenberg v. Security Management Co.*, 667 F.2d 958, 961 (11th Cir. 1982), *citing Blum*, 539 F.2d at 1390. "In such circumstances, where there is substantial likelihood that the derivative action will be used as a weapon in the plaintiff shareholder's arsenal, and not as a device for the protection of all shareholders, other courts have properly refused to permit the derivative action to proceed." *Owen v. Diversified Industries, Inc.*, 643 F.2d 441, 443 (6th Cir. 1981), *citing Blum*, 539 F.2d at 1390 (Although Morgan Guaranty did

-38-

not file suit against Blum until after Blum had purchased its
stock, Moran Guaranty knew beforehand and had notified Blum three
times that he was in default on a note and that Morgan Guaranty
would sue him if Blum failed to pay, so the Fifth Circuit found
that the district court was justified in determining that Blum's
prepurchase knowledge of his default along with the brief time
between his purchase and his filing of the derivative suit against
Morgan Guaranty "brand Blum's suit as a mere attempt to 'obtain
leverage' in negotiating his huge personal indebtedness to
defendant Morgan Guaranty."), [18] and *G.A. Enterprises, Inc. v.
Leisure Living Communities, Inc.*, 517 F.2d 24, 26-27 (1st Cir.
1975)(dismissing suit under Rule 23.1 where representative
plaintiff owned less that one percent of the defendant
corporation's common stock, the derivative action was filed after
an outburst of disputes between defendant and the corporation,
where there was an obvious conflict of interest, where plaintiff's
stake in the derivative suit paled in comparison with the
magnitude of the corporation's outside interests, and where
plaintiff could not assure that it would fairly and adequately
represent the interests of the shareholders because manipulated as

---

[18] The Fifth Circuit opined in *Blum*, 539 F.2d at 1390, and
cited for that proposition in *Darrow*, 574 F.2d at 1337,

> While a plaintiff is not necessarily disabled to bring
> suit simply because some of his interests extend beyond
> that of the class, the court may take into account
> outside entanglements that render it likely that the
> representative may disregard the interests of the other
> class members.

a weapon, "the derivative suit would serve interests beyond and
perhaps contrary to those of the other minority shareholders";
"Rule 23.1 recognizes the binding effect of derivative litigation
on all stockholders and the company and accordingly forbids
maintenance of such a suit by a plaintiff unable to provide fair
and adequate representation."). Third Party Defendants further
state that they anticipate that Third Party Plaintiffs will use
their derivative action to disqualify Aztec's counsel, thus
suggesting that Plaintiffs are using this suit in retaliation for
the lawsuit filed against them.[19] Third Party Defendants maintain,
in sum, that Third Party Plaintiffs do not fairly and adequately
represent the other shareholders and thus the derivative action
should be dismissed.

Last, Third Party Defendants contend that Third Party
Plaintiffs did not sufficiently plead futility. Conclusory
statements relating to futility or demand are not sufficient under
the heightened pleading requirements of Rule 23.1. Absent
particularized allegations to the contrary, the business judgment
rule will give rise to a presumption that directors acted in an
informed basis and in the honest belief that their decisions were
in furtherance of the best interest of the corporation and the
shareholders. *Bartlinski v. Sanchez*, 39 F. Supp. 3d 862, 866
(S.D. Tex. 2014). Because Third Party Plaintiffs have failed to

---

[19] This Court notes that "purely hypothetical, potential or
remote conflicts of interests never disable the individual
plaintiff." *Youngman*, 457 A.2d at 380-81, *citing* 7A Wright &
Miller *Federal Practice and Procedure* § 1833 (1972).

plead futility with particularity, they failed to satisfy the requirements of Rule 23.1 and therefore lack standing to bring this derivative action against Aztec.

### Third Party Plaintiffs' Response (#35)

Insisting that the First Amended Third Party Complaint has cured the deficiencies asserted by Third Party Defendants by adding additional facts, Third Party Plaintiffs contend that Plaintiffs' claims are grounded in statutes or rules for which there is no private right of action, that the claims have not been pleaded with the requisite specificity, that they are barred by limitations, and that they are false.

Third Party Plaintiffs conclusorily maintain that there was no impropriety in the April 2004 merger of Aztec Utah and Aztec Nevada, nor in the June 2004 issuance and sale by Aztec of Series A preferred stock, and that both actions have been ratified by Aztec's directors and management. They insist that the alleged facts raise a reasonable doubt that the challenged transactions, including the rejection of Fisher's written demand for a shareholders' meeting, are the product of a valid exercise of business judgment by such directors. As a result any further demand is excused as futile.

Third Party Plaintiffs claim that their complaint pleads facts showing reasonable doubt as to futility that excuses demand: Driver, Lehrer, and Vance, comprising the majority of Aztec's directors at the key times, have directed and implemented a

scheme[20] with no business purpose other than to diminish the interests of the shareholders, especially those with significant interests and voting power, in order to materially enhance their own personal interests and to perpetuate their positions with

---

[20] The scheme includes the following alleged events: Driver's attempt to usurp corporate opportunity by purchasing at a favorable price a controlling or substantial interest in Aztec shares of stock from its terminated former president in exchange for causing Aztec to drop its malfeasance claim against him and to pay the former president's litigating costs; the decision by Driver, Lehrer, and Vance to provide no notice of the April 2, 2015 directors meeting to Fisher and Sonfield even though there existed a board resolution and a prior agreement to include them in such meetings; the expansion of the board to four directors and appointment of Driver in the newly created directorship by Lehrer and Vance despite Driver's entanglement in a Department of Justice criminal investigation, his involvement in Duma Energy Corporation and its merger with his father-in-law's company causing substantial dilution of other shareholders' interests, and his representation by the same lawyers as his father-in-law in orchestrating these events; the amendment of the bylaws at the April 2, 2015 so as to eliminate the right of Aztec shareholders to act by written consent and the right of shareholders who together own of record at least 25% of all outstanding stock of all classes to vote to call a special meeting of shareholders, resulting instead in only a majority of the board of directors, the chairman of the board of directors or the chief executive officer's being able to call a shareholders' meeting; the alleged approval of the resolution to terminate retroactively the Consulting Agreements with IFD and Fisher and to engage a law firm to sue Fisher, IFD, and Sonfield to avoid payment of substantial sums due and owing to these parties and to seek recovery of stock shares, options, and warrants allegedly impermissibly granted; use of Aztec assets to finance the directors' personal efforts to seize control of Aztec from its shareholders; commission of corporate waste by Defendants' failure to properly account for funds received; failure to pay off Aztec's obligations even at the risk of impairment or loss of its mineral interests in drilling programs; and their refusal to hold a shareholders' meeting in response to Fisher's written demand in order to elect directors and review the actions taken at the April 2, 2015 meeting.

Aztec.  In addition they have wasted Aztec's assets.  The allegations show substantial adversity between the director Third Party Defendants and shareholders with significant voting power and demonstrate that the directors oppose being governed by shareholder vote.  Nor, they conclusorily insist, is there any likelihood that the shareholders would respond affirmatively to a pre-suit shareholder demand for corrective action.  Thus Third Party Plaintiffs maintain that they have raised a reasonable doubt that directors are disinterested and independent and that the challenged transactions are the product of a valid exercise of business judgment.  They have shown that the Third Party Defendants, who constitute the majority of Aztec's directors, in their self-dealing are deliberately adverse and hostile to the interests of the shareholders, are working to materially enhance their personal percentage shareholding interest, voting power, and influence at the expense of other shareholders, and are acting in their own best interest at the expense of the interests of the other shareholders.  If successful, Third Party Defendants would become the largest or among the largest shareholders in Aztec at a great enhancement of the value of their own shares.  Third Party Plaintiffs insist they have shown that these directors are not disinterested and not independent.

Even if the Court should find the are disinterested and independent, Third Party Defendants argue that their decisions and actions in bad faith to restrict shareholder meetings, diminish shareholder voting power, and strip shareholders of their shares

are not protected by the business judgment rule because they are so "extreme or curious" that they raise legitimate grounds to justify further inquiry and judicial review.  Thus they ask the Court to deny Third Party Defendants' motion to dismiss.

**Third Party Defendants' Reply (#38)**

Reiterating their earlier allegations that Third Party Plaintiffs do not fairly and adequately represent the interests of the shareholders and do not resolve the issues of their standing to bring derivative claims,[21] Third Party Defendants attempt to excuse their failure to make a demand by turning to Fisher's demand for a shareholder's meeting, which was refused by the directors, and maintaining that they have raised a reasonable doubt as to whether the challenged transactions at the April 2, 2015 meeting and the refusal of Fisher's demand were the product

---

[21] For example, they reiterate that courts have found shareholders do not to satisfy the "fair" and "adequate" standard where the plaintiff sought to gain control of the company during the year prior to filing the derivative suits, where the plaintiffs's interests extended beyond that of the claims in such a way that the plaintiff may disregard the interests of other class members, and in cases where the plaintiff was both the defendant sued by the corporation and the plaintiff in a derivative action. *Blum*, 539 F.2d at 1390; *Darrow*, 574 F.2d at 1337.  Like the plaintiff in *Darrow*, each Third Party Plaintiff here is being sued by Aztec for claims relating to breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary duty, conspiracy and violations of federal securities laws. Aztec's Complaint asserts that Defendants (also Third Party Plaintiffs) have obtained their stock position as a result of fraud upon the company.  The serious claims against them prevent Third Party Plaintiffs from being said to fairly and adequately represent other shareholders because there are extrinsic factors that render it likely that they may disregard the interests of the other shareholders in favor of themselves. *Darrow*, 574 F.2d at 1337; *Blum*, 539 F.2d at 1390.

of a valid exercise of business judgment.  Third Party Defendants
contend that Fisher's email (#34-1) fails to satisfy the standard
for a demand.  "The purpose of pre-suit demand is to assure that
the stockholder affords the corporation the opportunity to address
an alleged wrong without litigation, to decide whether to invest
the resources of the corporation in litigation, and to control any
litigation which does occur." *Spiegel v. Buntrock*, 571 A.2d 767,
773 (Del. Supr. 1990); *Simmonds v. Credit Suisse Securities (USA),
LLC*, 638 F.3d 1072, 1090 (9 [th] Cir. 2010).  Demand letters must
"specifically state: (I) the identity of the alleged wrongdoers,
(ii) the wrongdoing they allegedly perpetrated and the resultant
injury to the corporation, and (iii) the legal action the
shareholder wants the board to take on the corporation's behalf."
*Simmonds*, 638 F.3d at 1090.  They must be sufficiently specific to
"enable the board to perform its duty to make a good faith
investigation of claims of alleged wrongdoing and . . . to rectify
the misconduct" at issue in the lawsuit.  *Id.* at 1094.  Fisher's
email fails to identify the alleged wrongdoers (Driver, Lehrer,
and Vance), but only names Driver because of his telephone call to
Fisher and the fact that he is a newly named director, but there
is no statement of any alleged wrongdoing by him.  Furthermore the
email fails to specify the alleged wrongdoing and injury to the
company, it does not allege that any of the actions in Driver's
appointment or in the amendment of the employment agreement are
illegal or any harm to the company.  Instead it simply asserts
that these issues should be raised in a shareholder vote (of which

he and his Trust would have the majority share) rather than decided solely by the board.   Third, the email does not state with particularity the particular legal action that Fisher is demanding from the board, but only demands that the board call a shareholder meeting to vote on the actions taken at the meeting, including the election of Driver as a director and the decision to initiate suit against Fisher, Sonfield, Livingston and IFD.   This is a clear conflict of interest because Fisher, as the purported majority shareholder, in effect is demanding the ability to vote on whether to bring a lawsuit against himself, his company, and his Livingston Trust.   If the Board granted his request, it would result in an absurdity:   it would effectively give Fisher and the entities he controls the ability to eliminate any liability to Aztec for fraud, breach of fiduciary duties, securities law violations and other bad acts merely by exercising their majority interest.   Thus the demand on the company is insufficiently pleaded because it fails to provide the Board with an opportunity to make a good faith investigation into the claims of wrongdoing and to rectify the misconduct.   *Simmonds*, 638 F.3d at 1090.   This Court fully agrees.

Third Party Plaintiffs argue that they have pleaded futility to excuse their failure to make a pre-suit demand in that (1) the demand would request that Lehrer, Driver, and Vance sue themselves; (2) that they are directly interested in the transaction or occurrences that are the subject of this suit because they purportedly stand to "materially benefit from the

bylaw amendments limiting the voting power of Fisher, Livingston, and other Aztec shareholders; (3) the board failed to schedule the demanded shareholders' meeting, thus indicating a refusal to take any corrective action; (4) Third Party Defendants face potential liability for allegedly breaching their duties and wasting corporate assets; and (5) their actions would not have been the product of a good faith exercise of business judgment. Such conclusory statements have consistently been ruled insufficient by courts analyzing the futility requirement. *See, e.g., Bartlinski*, 39 F. Supp. 3d at 868 ("the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors"); *In re Citigroup, Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009)("demand is not excused merely because directors would have to sue themselves"). Furthermore, the actions taken by Third Party Defendants in their capacity as directors were not "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815; *Shoen*, 137 P.3d at 1184. All these actions fall squarely within the business judgment rule: Driver was elected a director; the consulting agreements between IFD and Aztec and between Fisher and Aztec Oil were retroactively terminated; Driver's employment agreement was modified; Aztec Oil's bylaws were amended to permit the majority of the board to call the shareholders' meetings; and it was

-47-

decided to sue Fisher, Sonfield, Livingston and IFD for fraud, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conspiracy, and violation of federal securities laws.  Each decision was made in a good faith belief that it was in the best interest of Aztec Oil.  For example, the decision to terminate the consulting agreements was in Aztec's best interest because Fisher was receiving double compensation for performing the same services and the termination saves the company from paying an unscrupulous former director twice for the same services.  The decision to sue was in Aztec Oil's best interest because litigation provides the company with an opportunity to address the grievances against it.

Third Party Defendants insist it is "axiomatic" that the claims against them are in retaliation for, and in direct conflict with, the claims that have been asserted against them in the main action and they should not be permitted to proceed.  This is evidenced by the fact that Wheeler, the son-in-law of Fisher, participated in the votes on the amendment to Driver's employment agreement and company bylaws, but was not named as a Third party Defendant.

Finally, if the Court finds that the demand is sufficient, Third Party Defendants argue that Third Party Plaintiffs are barred from pursuing their claim that demand was excused for futility.  Courts have repeatedly held that "a shareholder concedes that a demand is not futile by submitting a demand to the board." *Simmonds*, 638 F.3d at 1094; *FLI Deep Marine LLC v. McKim*,

C.A. No. 4138-VCN, 2009 WL 1204363, at *3 and n.17 (Del Ch. Apr. 21, 2009)(Shareholders "have conclusively conceded the independence of the Board, and are precluded from now arguing that demand should be excused because the directors are conflicted.") Third Party Plaintiffs argued in both their Response (#34, pp. 20, 25) and their Amended Complaint (#34, Ex. A, No. 35, pp. 4-5) that Fisher's email satisfied the Rule 23.1 demand requirement.   Thus they cannot now claim that further demand is futile.  Because Third Party Plaintiffs' demand was insufficient, as previously argued, they have not satisfied Rule 23.1.

## Court's Decision

The Court addresses Third Party Defendants' grounds for dismissing the derivative action in turn.

First, regarding Third Party Plaintiffs Fisher, Sonfield, and Livingston through Trustee Sonfield, Jr.'s standing to sue, the Court applies Rule 23.1's explicit requirements that a derivative plaintiff must fairly and adequately represent the interests of similarly situated shareholders and must be a stockholder of the corporation at the time of the transaction(s) in dispute, and the implicit factors established in *Youngman*, 457 A.2d at 379-81.

The simplest issue is the requirement that a derivative plaintiff must be a stockholder of the corporation at the relevant time.  As indicated in this Opinion and Order, Sonnfield is identified as a Houston attorney who was involved in the formation of Aztec Oil, the filing of the Articles of Incorporation in Nevada, and in acting in numerous matters pursuant to a power of

attorney for the Aztec Oil's directors after the board tendered their resignations on August 6, 2004. *See* Original Complaint,#1 at ¶¶ 5.35-5.50. Nowhere is it alleged that he held any Aztec Oil stock at any time. Accordingly, Sonnfield lacks standing to be a derivative plaintiff.

Sonnfield, Jr., the sole trustee of Livingston, has no personal interest in Livingston's shares of Aztec stock and it is nowhere alleged that he personally hold such shares. First Amended Third Party Complaint, #34, ¶26. Therefore in personal capacity he cannot serve as a derivative plaintiff here.

That  leaves Fisher and Livingston, a grantor trust established by Fisher in November 2010 for estate planning purposes, which according to the First Amended Third Party Complaint currently owns all 100,000 shares of Aztec's outstanding Series A preferred stock, 3,603,857 shares of its common stock, and 8,000,000 warrants for shares of its common stock. #34, at ¶25; see also Original Complaint, #1 at ¶¶5,34, 6.9, 6.12, 6.36. The Series A preferred stock always constitutes 70% of the voting rights of the Company, which Fisher and Livingston therefore control. Together Fisher and Livingston own more that 80% of the voting power in Aztec Oil. #34 ¶27.[22] The Original Complaint also states that Fisher through his ownership of IFD is a greater than 10% shareholder of Aztec Oil. #1 at ¶¶6.14-6.15. Thus Fisher and

---

[22] Although the derivative complaint conclusorily states, *id.*, that they do not control each other or act in concert, there are no factual allegations to support this claim nor trust documents to show that Fisher does not control the trusts assets.

Livingston are viable derivative plaintiffs with respect to the
stock ownership requirement.

The Court moves on to relevant "implicit," "extrinsic
factors," set out in *Youngman* for determining whether the
derivative plaintiffs can satisfy the adequacy and fairness
requirements of Rule 23.1 and that evidence "outside entanglements
that make it likely that the derivative plaintiff will pursue his
or its own interests at the expense of the other Aztec Oil's
shareholders. An unusual, key factor that stands out here is the
fact that Fisher and Livingston control more that 80% of the
voting power and constitute by far the majority shareholder of
Aztec Oil, making it highly likely that Fisher and the entities he
controls will pursue Fisher's own interests at the expense of all
minority shareholders and evidencing a serious conflict of
interests. Certainly Fisher is not representative of all the
other, plainly minority shareholders of Aztec Oil. Indeed, much
of what the Third Party Plaintiffs allege that Third party
Defendants are conspiring to accomplish is true of Fisher and
Livingston's current ability to control over Aztec Oil. In fact
the other shareholders' interests pale beside the magnitude of
Fisher and Livingston's and are overwhelmed by their voting power.
As Third Party Defendants have highlighted, if Third Party
Plaintiff Fisher were to prevail in the derivative action, he
would determine whether to bring a lawsuit against himself, his
company, and his Livingston Trust, resulting in an absurdity: it
would effectively give Fisher and the entities he controls the

-51-

ability to eliminate any liability to Aztec for fraud, breach of fiduciary duties, securities law violations and other bad acts merely by exercising their majority interest.  Moreover, the fact that Fisher and Livingston are Defendants in the main action and simultaneously the Plaintiffs in the subsequently filed derivative action clearly raises more than a specter that the derivative action was filed in retaliation and vindication of, and in direct conflict with, the claims that have been asserted against them in the main action, and as a weapon against or leverage in defending against that main action.

"Because of the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations, courts have generally characterized shareholder derivative suits as a remedy of last resort." *Kayes v. Pac Lumber Co.*, 51 F.3d 1449, 1463 (9th Cur. 1995), *cited for that proposition in Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010).  A derivative suit allows a stockholder "to step into the corporation's shoes and to seek in its right the restitution *he could not demand on his own*'" on a "cause of action derived from the corporation." [emphasis added by this Court].  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 528 (1984)  *Quinn*, 620 F.3d at , quoting Lewis v. Chiles, 719 F.3=2d 1044, 1047 (9th Cr. 1983).  The Court observes Fisher could and did assert his claim on his own and that the Court's decision to dismiss the derivative action does not leave Fisher without a remedy;  he has already asserted his allegations of breach of Executive Employment Agreement and

Consulting Agreement and indemnification for attorney's fees directly in a counterclaim (#14) to the main action.[23]

Accordingly for these reasons, the Court

---

[23] Fisher's Company, IFD, has also filed a counterclaim (#13) for breach of the Consulting Agreement it had with Aztec Oil.

ORDERS that Third Party Defendants' motion to dismiss the Third Party derivative action (#29) under Federal Rule of Civil Procedure 23.1 is GRANTED.

**SIGNED** at Houston, Texas, this _21st_ day of _January_, 2016.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE